# BARTNICKI ET AL. *v.* VOPPER, AKA WILLIAMS, ET AL.

No. 99–1687. Argued December 5, 2000—Decided May 21, 2001*

---

*Together with No. 99–1728, *United States* v. *Vopper, aka Williams, et al.,* also on certiorari to the same court.

*Jeremiah A. Collins* argued the cause for petitioners in No. 99–1687. With him on the briefs were *Raymond P. Wendolowski* and *Scott C. Gartley.*

*Solicitor General Waxman* argued the cause for the United States in No. 99–1728. With him on the briefs were

*Assistant Attorney General Ogden, Deputy Solicitor General Dreeben, Jeffrey A. Lamken,* and *Douglas N. Letter.*

*Lee Levine* argued the cause for respondents Vopper et al. With him on the brief was *Jay Ward Brown. Thomas C. Goldstein* argued the cause for respondent Yokum. With him on the brief were *Erik S. Jaffe* and *Frank J. Aritz.**

JUSTICE STEVENS delivered the opinion of the Court.

These cases raise an important question concerning what degree of protection, if any, the First Amendment provides to speech that discloses the contents of an illegally intercepted communication. That question is both novel and narrow. Despite the fact that federal law has prohibited such disclosures since 1934,[1] this is the first time that we have confronted such an issue.

The suit at hand involves the repeated intentional disclosure of an illegally intercepted cellular telephone conversation about a public issue. The persons who made the disclosures did not participate in the interception, but they did know—or at least had reason to know—that the inter-

---

*Briefs of *amici curiae* urging reversal were filed for the Cellular Telecommunications Industry Association by *Howard J. Symons* and *Michael F. Altschul;* and for Representative John A. Boehner by *Michael A. Carvin* and *David H. Thompson.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Steven Shapiro;* for Dow Jones & Co., Inc., by *Theodore B. Olson, Theodore J. Boutrous, Jr.,* and *Jack M. Weiss;* for the Liberty Project by *Nory Miller* and *Julia M. Carpenter;* for Media Entities and Organizations by *Floyd Abrams, George Freeman, Adam Liptak, Richard A. Bernstein, Jerry S. Birenz, Henry S. Hoberman, David A. Schulz, Eve Burton, Susanna M. Lowy, Harold W. Fuson, Jr., Barbara W. Wall, Anne Noble, Kenneth Vittor, René P. Milam, Lucy Dalglish, Bruce W. Sanford,* and *Eric Lieberman;* for WFAA–TV et al. by *Laurence H. Tribe, Jonathan S. Massey, William D. Sims, Jr., Thomas S. Leatherbury,* and *Marie R. Yeates;* and for Representative James A. McDermott by *Frank Cicero, Jr., Christopher Landau,* and *Daryl Joseffer.*

[1] See 48 Stat. 1069, 1103.

ception was unlawful. Accordingly, these cases present a conflict between interests of the highest order—on the one hand, the interest in the full and free dissemination of information concerning public issues, and, on the other hand, the interest in individual privacy and, more specifically, in fostering private speech. The Framers of the First Amendment surely did not foresee the advances in science that produced the conversation, the interception, or the conflict that gave rise to this action. It is therefore not surprising that Circuit judges, as well as the Members of this Court, have come to differing conclusions about the First Amendment's application to this issue. Nevertheless, having considered the interests at stake, we are firmly convinced that the disclosures made by respondents in this suit are protected by the First Amendment.

## I

During 1992 and most of 1993, the Pennsylvania State Education Association, a union representing the teachers at the Wyoming Valley West High School, engaged in collective-bargaining negotiations with the school board. Petitioner Kane, then the president of the local union, testified that the negotiations were "'contentious'" and received "a lot of media attention." App. 79, 92. In May 1993, petitioner Bartnicki, who was acting as the union's "chief negotiator," used the cellular phone in her car to call Kane and engage in a lengthy conversation about the status of the negotiations. An unidentified person intercepted and recorded that call.

In their conversation, Kane and Bartnicki discussed the timing of a proposed strike, id., at 41–45, difficulties created by public comment on the negotiations, id., at 46, and the need for a dramatic response to the board's intransigence. At one point, Kane said: "'If they're not gonna move for three percent, we're gonna have to go to their, their

homes . . . . To blow off their front porches, we'll have to do some work on some of those guys. (PAUSES). Really, uh, really and truthfully because this is, you know, this is bad news. (UNDECIPHERABLE).'" *Ibid.*

In the early fall of 1993, the parties accepted a nonbinding arbitration proposal that was generally favorable to the teachers. In connection with news reports about the settlement, respondent Vopper, a radio commentator who had been critical of the union in the past, played a tape of the intercepted conversation on his public affairs talk show. Another station also broadcast the tape, and local newspapers published its contents. After filing suit against Vopper and other representatives of the media, Bartnicki and Kane (hereinafter petitioners) learned through discovery that Vopper had obtained the tape from respondent Jack Yocum, the head of a local taxpayers' organization that had opposed the union's demands throughout the negotiations. Yocum, who was added as a defendant, testified that he had found the tape in his mailbox shortly after the interception and recognized the voices of Bartnicki and Kane. Yocum played the tape for some members of the school board, and later delivered the tape itself to Vopper.

## II

In their amended complaint, petitioners alleged that their telephone conversation had been surreptitiously intercepted by an unknown person using an electronic device, that Yocum had obtained a tape of that conversation, and that he intentionally disclosed it to Vopper, as well as other individuals and media representatives. Thereafter, Vopper and other members of the media repeatedly published the contents of that conversation. The amended complaint alleged that each of the defendants "knew or had reason to know" that the recording of the private telephone conversation had been obtained by means of an illegal interception. *Id.,*

at 27. Relying on both federal and Pennsylvania statutory provisions, petitioners sought actual damages, statutory damages, punitive damages, and attorney's fees and costs.[2]

After the parties completed their discovery, they filed cross-motions for summary judgment. Respondents contended that they had not violated the statute because (a) they had nothing to do with the interception, and (b) in any event, their actions were not unlawful since the conversation might have been intercepted inadvertently. Moreover, even if they had violated the statute by disclosing the intercepted conversation, respondents argued, those disclosures were protected by the First Amendment. The District Court rejected the first statutory argument because, under the plain statutory language, an individual violates the federal Act by intentionally disclosing the contents of an electronic communication when he or she "know[s] or ha[s] reason to know that the information was obtained" through an illegal interception.[3] App. to Pet. for Cert. in No. 99–1687, pp. 53a–54a (emphasis deleted). Accordingly, actual involvement in the illegal interception is not necessary in order to establish a violation of that statute. With respect to the second statutory argument, the District Court agreed that petitioners had to prove that the interception in ques-

___

[2] Either actual damages or "statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000" may be recovered under 18 U. S. C. § 2520(c)(2); under the Pennsylvania Act, the amount is the greater of $100 a day or $1,000, but the plaintiff may also recover punitive damages and reasonable attorney's fees. 18 Pa. Cons. Stat. § 5725(a) (2000).

[3] Title 18 U. S. C. § 2511(1)(c) provides that any person who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; . . . shall be punished . . . ." The Pennsylvania Act contains a similar provision.

tion was intentional,[4] but concluded that the text of the interception raised a genuine issue of material fact with respect to intent. That issue of fact was also the basis for the District Court's denial of petitioners' motion. Finally, the District Court rejected respondents' First Amendment defense because the statutes were content-neutral laws of general applicability that contained "no indicia of prior restraint or the chilling of free speech." *Id.*, at 55a–56a.

Thereafter, the District Court granted a motion for an interlocutory appeal, pursuant to 28 U. S. C. § 1292(b). It certified as controlling questions of law: "(1) whether the imposition of liability on the media Defendants under the [wiretapping statutes] solely for broadcasting the newsworthy tape on the Defendant [Vopper's] radio news/public affairs program, when the tape was illegally intercepted and recorded by unknown persons who were not agents of [the] Defendants, violates the First Amendment; and (2) whether imposition of liability under the aforesaid [wiretapping] statutes on Defendant Jack Yocum solely for providing the anonymously intercepted and recorded tape to the media Defendants violates the First Amendment." App. to Pet. for Cert. in No. 99–1728, p. 76a. The Court of Appeals accepted the appeal, and the United States, also a petitioner, intervened pursuant to 28 U. S. C. § 2403 in order to defend the constitutionality of the federal statute.

All three members of the panel agreed with petitioners and the Government that the federal and Pennsylvania wiretapping statutes are "content-neutral" and therefore subject to "intermediate scrutiny." 200 F. 3d 109, 121 (CA3 1999). Applying that standard, the majority concluded that the

---

[4] Title 18 U. S. C. § 2511(1)(a) provides: "(1) Except as otherwise specifically provided in this chapter [§§ 2510–2520 (1994 ed. and Supp. V)] any person who—

"(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; . . . shall be punished . . . ."

statutes were invalid because they deterred significantly more speech than necessary to protect the privacy interests at stake. The court remanded the case with instructions to enter summary judgment for respondents. In dissent, Senior Judge Pollak expressed the view that the prohibition against disclosures was necessary in order to remove the incentive for illegal interceptions and to preclude compounding the harm caused by such interceptions through wider dissemination. In so doing, he agreed with the majority opinion in a similar case decided by the Court of Appeals for the District of Columbia, *Boehner* v. *McDermott*, 191 F. 3d 463 (1999). See also *Peavy* v. *WFAA–TV, Inc.*, 221 F. 3d 158 (CA5 2000).[5] We granted certiorari to resolve the conflict. 530 U. S. 1260 (2000).

## III

As we pointed out in *Berger* v. *New York*, 388 U. S. 41, 45–49 (1967), sophisticated (and not so sophisticated) methods of eavesdropping on oral conversations and intercepting telephone calls have been practiced for decades, primarily by law enforcement authorities.[6] In *Berger*, we held that New

---

[5] In the *Boehner* case, as in this suit, a conversation over a car cell phone was intercepted, but in that case the defendant knew both who was responsible for intercepting the conversation and how they had done it. 191 F. 3d, at 465. In the opinion of the majority, the defendant acted unlawfully in accepting the tape in order to provide it to the media. *Id.*, at 476. Apparently because the couple responsible for the interception did not eavesdrop "for purposes of direct or indirect commercial advantage or private financial gain," they were fined only $500. See Department of Justice Press Release, Apr. 23, 1997. In another similar case involving a claim for damages under §2511(1)(c), *Peavy* v. *WFAA–TV, Inc.*, 221 F. 3d 158 (CA5 2000), the media defendant in fact participated in the interceptions at issue.

[6] In particular, calls placed on cellular and cordless telephones can be intercepted more easily than those placed on traditional phones. See *Shubert* v. *Metrophone, Inc.*, 898 F. 2d 401, 404–405 (CA3 1990). Although calls placed on cell and cordless phones can be easily intercepted, it is not clear how often intentional interceptions take place. From 1992 through

York's broadly written statute authorizing the police to conduct wiretaps violated the Fourth Amendment. Largely in response to that decision, and to our holding in *Katz* v. *United States*, 389 U. S. 347 (1967), that the attachment of a listening and recording device to the outside of a telephone booth constituted a search, "Congress undertook to draft comprehensive legislation both authorizing the use of evidence obtained by electronic surveillance on specified conditions, and prohibiting its use otherwise. S. Rep. No. 1097, 90th Cong., 2d Sess., 66 (1968)." *Gelbard* v. *United States*, 408 U. S. 41, 78 (1972) (REHNQUIST, J., dissenting). The ultimate result of those efforts was Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 211, entitled Wiretapping and Electronic Surveillance.

One of the stated purposes of that title was "to protect effectively the privacy of wire and oral communications." *Ibid.* In addition to authorizing and regulating electronic surveillance for law enforcement purposes, Title III also regulated private conduct. One part of those regulations, § 2511(1), defined five offenses punishable by a fine of not more than $10,000, by imprisonment for not more than five years, or by both. Subsection (a) applied to any person who "willfully intercepts . . . any wire or oral communication." Subsection (b) applied to the intentional use of devices designed to intercept oral conversations; subsection (d) applied to the use of the contents of illegally intercepted wire or

1997, less than 100 cases were prosecuted charging violations of 18 U. S. C. § 2511. See Statement of James K. Kallstrom, Assistant Director in Charge of the New York Division of the FBI on February 5, 1997 before the Subcommittee on Telecommunications, Trade, and Consumer Protection, Committee on Commerce, U. S. House of Representatives Regarding Cellular Privacy. However, information concerning techniques and devices for intercepting cell and cordless phone calls can be found in a number of publications, trade magazines, and sites on the Internet, see *id.*, at 6, and at one set of congressional hearings in 1997, a scanner, purchased off the shelf and minimally modified, was used to intercept phone calls of Members of Congress.

oral communications; and subsection (e) prohibited the unauthorized disclosure of the contents of interceptions that were authorized for law enforcement purposes. Subsection (c), the original version of the provision most directly at issue in this suit, applied to any person who "willfully discloses, or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection." The oral communications protected by the Act were only those "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." § 2510(2).

As enacted in 1968, Title III did not apply to the monitoring of radio transmissions. In the Electronic Communications Privacy Act of 1986, 100 Stat. 1848, however, Congress enlarged the coverage of Title III to prohibit the interception of "electronic" as well as oral and wire communications. By reason of that amendment, as well as a 1994 amendment which applied to cordless telephone communications, 108 Stat. 4279, Title III now applies to the interception of conversations over both cellular and cordless phones.[7] Although a lesser criminal penalty may apply to the interception of such transmissions, the same civil remedies are available whether the communication was "oral," "wire," or "electronic," as defined by 18 U. S. C. § 2510 (1994 ed. and Supp. V).

## IV

The constitutional question before us concerns the validity of the statutes as applied to the specific facts of these cases. Because of the procedural posture of these cases, it is appropriate to make certain important assumptions about those

---

[7] See, e. g., Nix v. O'Malley, 160 F. 3d 343, 346 (CA6 1998); McKamey v. Roach, 55 F. 3d 1236, 1240 (CA6 1995).

facts. We accept petitioners' submission that the interception was intentional, and therefore unlawful, and that, at a minimum, respondents "had reason to know" that it was unlawful. Accordingly, the disclosure of the contents of the intercepted conversation by Yocum to school board members and to representatives of the media, as well as the subsequent disclosures by the media defendants to the public, violated the federal and state statutes. Under the provisions of the federal statute, as well as its Pennsylvania analogue, petitioners are thus entitled to recover damages from each of the respondents. The only question is whether the application of these statutes in such circumstances violates the First Amendment.[8]

In answering that question, we accept respondents' submission on three factual matters that serve to distinguish most of the cases that have arisen under §2511. First, respondents played no part in the illegal interception. Rather, they found out about the interception only after it occurred, and in fact never learned the identity of the person or persons who made the interception. Second, their access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else. Cf. *Florida Star* v. *B. J. F.*, 491 U. S. 524, 536 (1989) ("Even assuming the Constitution permitted a State to proscribe *receipt* of information, Florida has not taken this step"). Third, the subject matter of the conversation was a matter of public concern. If the statements about the labor negotiations had been made in a public arena—during a bargaining session, for example—they would have been newsworthy. This would also be true if a third party had inadvertently overheard Bartnicki making the same statements to Kane when the two thought they were alone.

---

[8] In answering this question, we draw no distinction between the media respondents and Yocum. See, *e. g.*, *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 265–266 (1964); *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 777 (1978).

## V

We agree with petitioners that §2511(1)(c), as well as its Pennsylvania analog, is in fact a content-neutral law of general applicability. "Deciding whether a particular regulation is content based or content neutral is not always a simple task. . . . As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 642–643 (1994). In determining whether a regulation is content based or content neutral, we look to the purpose behind the regulation; typically, "[g]overnment regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.'" *Ward* v. *Rock Against Racism*, 491 U. S. 781, 791 (1989).[9]

In this suit, the basic purpose of the statute at issue is to "protec[t] the privacy of wire[, electronic,] and oral communications." S. Rep. No. 1097, 90th Cong., 2d Sess., 66 (1968). The statute does not distinguish based on the content of the intercepted conversations, nor is it justified by reference to the content of those conversations. Rather, the communications at issue are singled out by virtue of the fact that they were illegally intercepted—by virtue of the source, rather than the subject matter.

On the other hand, the naked prohibition against disclosures is fairly characterized as a regulation of pure speech. Unlike the prohibition against the "use" of the contents of

---

[9] "But while a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary to such a showing in all cases. . . . Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content." *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 642–643 (1994).

an illegal interception in § 2511(1)(d),[10] subsection (c) is not a regulation of conduct. It is true that the delivery of a tape recording might be regarded as conduct, but given that the purpose of such a delivery is to provide the recipient with the text of recorded statements, it is like the delivery of a handbill or a pamphlet, and as such, it is the kind of "speech" that the First Amendment protects.[11] As the majority below put it, "[i]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct." 200 F. 3d, at 120.

## VI

As a general matter, "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Smith* v. *Daily Mail Publishing Co.*, 443 U. S. 97, 102 (1979). More specifically, this Court has repeatedly

---

[10] The Solicitor General has cataloged some of the cases that fall under subsection (d): "[I]t is unlawful for a company to use an illegally intercepted communication about a business rival in order to create a competing product; it is unlawful for an investor to use illegally intercepted communications in trading in securities; it is unlawful for a union to use an illegally intercepted communication about management (or vice versa) to prepare strategy for contract negotiations; it is unlawful for a supervisor to use information in an illegally recorded conversation to discipline a subordinate; and it is unlawful for a blackmailer to use an illegally intercepted communication for purposes of extortion. See, *e. g.*, 1968 Senate Report 67 (corporate and labor-management uses); *Fultz* v. *Gilliam*, 942 F. 2d 396, 400 n. 4 (6th Cir. 1991) (extortion); *Dorris* v. *Absher*, 959 F. Supp. 813, 815–817 (M. D. Tenn. 1997) (workplace discipline), aff'd in part, rev'd in part, 179 F. 3d 420 (6th Cir. 1999). The statute has also been held to bar the use of illegally intercepted communications for important and socially valuable purposes. See *In re Grand Jury*, 111 F. 3d 1066, 1077–1079 (3d Cir. 1997)." Brief for United States 24.

[11] Put another way, what gave rise to statutory liability in this suit was the information communicated on the tapes. See *Boehner* v. *McDermott*, 191 F. 3d 463, 484 (CADC 1999) (Sentelle, J., dissenting) ("What . . . is being punished . . . here is not conduct dependent upon the nature or origin of the tapes; it is speech dependent upon the nature of the contents").

held that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of the highest order." *Id.*, at 103; see also *Florida Star* v. *B. J. F.*, 491 U. S. 524 (1989); *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829 (1978).

Accordingly, in *New York Times Co.* v. *United States*, 403 U. S. 713 (1971) *(per curiam)*, the Court upheld the right of the press to publish information of great public concern obtained from documents stolen by a third party. In so doing, that decision resolved a conflict between the basic rule against prior restraints on publication and the interest in preserving the secrecy of information that, if disclosed, might seriously impair the security of the Nation. In resolving that conflict, the attention of every Member of this Court was focused on the character of the stolen documents' contents and the consequences of public disclosure. Although the undisputed fact that the newspaper intended to publish information obtained from stolen documents was noted in Justice Harlan's dissent, *id.*, at 754, neither the majority nor the dissenters placed any weight on that fact.

However, *New York Times* v. *United States* raised, but did not resolve, the question "whether, in cases where information has been acquired *unlawfully* by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well."[12] *Florida Star*, 491 U. S., at 535, n. 8. The question here, however, is a narrower version of that still-open question. Simply put, the issue here is this: "Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?" *Boehner*, 191 F. 3d, at 484–485 (Sentelle, J., dissenting).

---

[12] That question was subsequently reserved in *Landmark Communications, Inc.* v. *Virginia*, 435 U. S. 829, 837 (1978).

Our refusal to construe the issue presented more broadly is consistent with this Court's repeated refusal to answer categorically whether truthful publication may ever be punished consistent with the First Amendment. Rather,

"[o]ur cases have carefully eschewed reaching this ultimate question, mindful that the future may bring scenarios which prudence counsels our not resolving anticipatorily. . . . We continue to believe that the sensitivity and significance of the interests presented in clashes between [the] First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Florida Star*, 491 U. S., at 532–533.

See also *Landmark Communications*, 435 U. S., at 838. Accordingly, we consider whether, given the facts of these cases, the interests served by § 2511(1)(c) can justify its restrictions on speech.

The Government identifies two interests served by the statute—first, the interest in removing an incentive for parties to intercept private conversations, and second, the interest in minimizing the harm to persons whose conversations have been illegally intercepted. We assume that those interests adequately justify the prohibition in § 2511(1)(d) against the interceptor's own use of information that he or she acquired by violating § 2511(1)(a), but it by no means follows that punishing disclosures of lawfully obtained information of public interest by one not involved in the initial illegality is an acceptable means of serving those ends.

The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it. If the sanctions that presently attach to a violation of § 2511(1)(a) do not provide sufficient deterrence, perhaps those sanctions should be made more severe. But it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter

conduct by a non-law-abiding third party. Although there are some rare occasions in which a law suppressing one party's speech may be justified by an interest in deterring criminal conduct by another, see, *e. g., New York* v. *Ferber*, 458 U. S. 747 (1982),[13] this is not such a case.

With only a handful of exceptions, the violations of § 2511(1)(a) that have been described in litigated cases have been motivated by either financial gain or domestic disputes.[14] In virtually all of those cases, the identity of the person or persons intercepting the communication has been known.[15] Moreover, petitioners cite no evidence that Congress viewed the prohibition against disclosures as a response to the difficulty of identifying persons making improper use of scanners and other surveillance devices and accordingly of deterring such conduct,[16] and there is no

---

[13] In cases relying on such a rationale, moreover, the speech at issue is considered of minimal value. *Osborne* v. *Ohio*, 495 U. S. 103 (1990); *New York* v. *Ferber*, 458 U. S., at 762 ("The value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimis*").

The Government also points to two other areas of the law—namely, mail theft and stolen property—in which a ban on the receipt or possession of an item is used to deter some primary illegality. Brief for United States 14; see also *post*, at 550–551 (REHNQUIST, C. J., dissenting). Neither of those examples, though, involve prohibitions on speech. As such, they are not relevant to a First Amendment analysis.

[14] The media respondents have included a list of 143 cases under § 2511(1)(a) and 63 cases under §§ 2511(1)(c) and (d)—which must also involve violations of subsection (a)—in an appendix to their brief. The Reply Brief filed by the United States contains an appendix describing each of the cases in the latter group.

[15] In only 5 of the 206 cases listed in the appendixes, see n. 14, *supra*, n. 17, *infra*, was the identity of the interceptor wholly unknown.

[16] The legislative history of the 1968 Act indicates that Congress' concern focused on private surveillance "in domestic relations and industrial espionage situations." S. Rep. No. 1097, 90th Cong., 2d Sess., 225 (1968). Similarly, in connection with the enactment of the 1986 amendment, one Senator referred to the interest in protecting private communications

empirical evidence to support the assumption that the prohibition against disclosures reduces the number of illegal interceptions.[17]

Although this suit demonstrates that there may be an occasional situation in which an anonymous scanner will risk criminal prosecution by passing on information without any expectation of financial reward or public praise, surely this is the exceptional case. Moreover, there is no basis for assuming that imposing sanctions upon respondents will deter the unidentified scanner from continuing to engage in surreptitious interceptions. Unusual cases fall far short of a

---

from "a corporate spy, a police officer without probable cause, or just a plain snoop." 131 Cong. Rec. 24366 (1985) (statement of Sen. Leahy).

[17] The dissent argues that we have not given proper respect to "congressional findings" or to "'Congress' factual predictions.'" *Post*, at 550. But the relevant factual foundation is not to be found in the legislative record. Moreover, the dissent does not argue that Congress did provide empirical evidence in support of its assumptions, nor, for that matter, does it take real issue with the fact that in the vast majority of cases involving illegal interceptions, the identity of the person or persons responsible for the interceptions is known. Instead, the dissent advances a minor disagreement with our numbers, stating that nine cases "involved an unknown *or unproved* eavesdropper." *Post*, at 552, n. 9 (emphasis added). The dissent includes in that number cases in which the identity of the interceptor, though suspected, was not "proved" because the identity of the interceptor was not at issue or the evidence was insufficient. In any event, whether there are 5 cases or 9 involving anonymous interceptors out of the 206 cases under § 2511, in most of the cases involving illegal interceptions, the identity of the interceptor is no mystery. If, as the proponents of the dry-up-the-market theory would have it, it is difficult to identify the persons responsible for illegal interceptions (and thus necessary to prohibit disclosure by third parties with no connection to, or responsibility for, the initial illegality), one would expect to see far more cases in which the identity of the interceptor was unknown (and, concomitantly, far fewer in which the interceptor remained anonymous). Thus, not only is there a dearth of evidence in the legislative record to support the dry-up-the-market theory, but what postenactment evidence is available cuts against it.

showing that there is a "need . . . of the highest order" for a rule supplementing the traditional means of deterring antisocial conduct. The justification for any such novel burden on expression must be "far stronger than mere speculation about serious harms." *United States* v. *Treasury Employees*, 513 U. S. 454, 475 (1995).[18] Accordingly, the Government's first suggested justification for applying § 2511(1)(c) to an otherwise innocent disclosure of public information is plainly insufficient.[19]

The Government's second argument, however, is considerably stronger. Privacy of communication is an important interest, *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 539, 559 (1985),[20] and Title III's restrictions are intended to protect that interest, thereby "encouraging the uninhibited exchange of ideas and information among private parties . . . ." Brief for United States 27. More-

---

[18] Indeed, even the burden of justifying restrictions on commercial speech requires more than "'mere speculation or conjecture.'" *Greater New Orleans Broadcasting Assn., Inc.* v. *United States*, 527 U. S. 173, 188 (1999).

[19] Our holding, of course, does not apply to punishing parties for obtaining the relevant information unlawfully. "It would be frivolous to assert—and no one does in these cases—that the First Amendment, in the interest of securing news or otherwise, confers a license on either the reporter or his news sources to violate valid criminal laws. Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news." *Branzburg* v. *Hayes*, 408 U. S. 665, 691 (1972).

[20] "'The essential thrust of the First Amendment is to prohibit improper restraints on the *voluntary* public expression of ideas; it shields the man who wants to speak or publish when others wish him to be quiet. There is necessarily, and within suitably defined areas, a concomitant freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect.'" *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U. S., at 559 (quoting *Estate of Hemingway* v. *Random House, Inc.*, 23 N. Y. 2d 341, 348, 244 N. E. 2d 250, 255 (1968)).

over, the fear of public disclosure of private conversations might well have a chilling effect on private speech.

> "In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively. Fear or suspicion that one's speech is being monitored by a stranger, even without the reality of such activity, can have a seriously inhibiting effect upon the willingness to voice critical and constructive ideas." President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 202 (1967).

Accordingly, it seems to us that there are important interests to be considered on *both* sides of the constitutional calculus. In considering that balance, we acknowledge that some intrusions on privacy are more offensive than others, and that the disclosure of the contents of a private conversation can be an even greater intrusion on privacy than the interception itself. As a result, there is a valid independent justification for prohibiting such disclosures by persons who lawfully obtained access to the contents of an illegally intercepted message, even if that prohibition does not play a significant role in preventing such interceptions from occurring in the first place.

We need not decide whether that interest is strong enough to justify the application of § 2511(c) to disclosures of trade secrets or domestic gossip or other information of purely private concern. Cf. *Time, Inc.* v. *Hill,* 385 U. S. 374, 387–388 (1967) (reserving the question whether truthful publication of private matters unrelated to public affairs can be constitutionally proscribed). In other words, the outcome of these cases does not turn on whether § 2511(1)(c) may be enforced with respect to most violations of the statute without offending the First Amendment. The enforcement of that provision in these cases, however, implicates the core purposes

of the First Amendment because it imposes sanctions on the publication of truthful information of public concern.

In these cases, privacy concerns give way when balanced against the interest in publishing matters of public importance. As Warren and Brandeis stated in their classic law review article: "The right of privacy does not prohibit any publication of matter which is of public or general interest." The Right to Privacy, 4 Harv. L. Rev. 193, 214 (1890). One of the costs associated with participation in public affairs is an attendant loss of privacy.

> "Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press. 'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.'" *Time, Inc.* v. *Hill,* 385 U. S., at 388 (quoting *Thornhill* v. *Alabama,* 310 U. S. 88, 102 (1940)).[21]

Our opinion in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), reviewed many of the decisions that settled the "general proposition that freedom of expression upon public questions is secured by the First Amendment." *Id.,* at 269; see *Roth* v. *United States,* 354 U. S. 476, 484 (1957); *Bridges* v. *California,* 314 U. S. 252, 270 (1941); *Stromberg* v. *California,* 283 U. S. 359, 369 (1931). Those cases all relied on our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times,* 376 U. S., at 270; see *Terminiello* v. *Chicago,* 337 U. S. 1, 4 (1949); *De Jonge* v. *Oregon,*

---

[21] Moreover, "our decisions establish that absent exceptional circumstances, reputational interests alone cannot justify the proscription of truthful speech." *Butterworth* v. *Smith,* 494 U. S. 624, 634 (1990).

299 U. S. 353, 365 (1937); *Whitney* v. *California,* 274 U. S. 357, 375–376 (1927) (Brandeis, J., concurring); see also *Roth,* 354 U. S., at 484; *Stromberg,* 283 U. S., at 369; *Bridges,* 314 U. S., at 270. It was the overriding importance of that commitment that supported our holding that neither factual error nor defamatory content, nor a combination of the two, sufficed to remove the First Amendment shield from criticism of official conduct. *Id.,* at 273; see also *NAACP* v. *Button,* 371 U. S. 415, 445 (1963); *Wood* v. *Georgia,* 370 U. S. 375 (1962); *Craig* v. *Harney,* 331 U. S. 367 (1947); *Pennekamp* v. *Florida,* 328 U. S. 331, 342, 343, n. 5, 345 (1946); *Bridges,* 314 U. S., at 270.

We think it clear that parallel reasoning requires the conclusion that a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern.[22] The months of negotiations over the proper level of compensation for teachers at the Wyoming Valley West High School were unquestionably a matter of public concern, and respondents were clearly engaged in debate about that concern. That debate may be more mundane than the Communist rhetoric that inspired Justice Brandeis' classic opinion in *Whitney* v. *California,* 274 U. S., at 372, but it is no less worthy of constitutional protection.

The judgment is affirmed.

*It is so ordered.*

JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, concurring.

I join the Court's opinion. I agree with its narrow holding limited to the special circumstances present here: (1) the radio broadcasters acted lawfully (up to the time of final public disclosure); and (2) the information publicized in-

---

[22] See, *e. g., Florida Star* v. *B. J. F.,* 491 U. S. 524, 535 (1989) (acknowledging "the 'timidity and self-censorship' which may result from allowing the media to be punished for publishing truthful information").

volved a matter of unusual public concern, namely, a threat of potential physical harm to others. I write separately to explain why, in my view, the Court's holding does not imply a significantly broader constitutional immunity for the media.

As the Court recognizes, the question before us—a question of immunity from statutorily imposed civil liability—implicates competing constitutional concerns. *Ante*, at 532–533. The statutes directly interfere with free expression in that they prevent the media from publishing information. At the same time, they help to protect personal privacy—an interest here that includes not only the "right to be let alone," *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting), but also "the interest . . . in fostering private speech," *ante*, at 518. Given these competing interests "on both sides of the equation, the key question becomes one of proper fit." *Turner Broadcasting System, Inc.* v. *FCC*, 520 U. S. 180, 227 (1997) (BREYER, J., concurring in part). See also *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 402 (2000) (BREYER, J., concurring).

I would ask whether the statutes strike a reasonable balance between their speech-restricting and speech-enhancing consequences. Or do they instead impose restrictions on speech that are disproportionate when measured against their corresponding privacy and speech-related benefits, taking into account the kind, the importance, and the extent of these benefits, as well as the need for the restrictions in order to secure those benefits? What this Court has called "strict scrutiny"—with its strong presumption against constitutionality—is normally out of place where, as here, important competing constitutional interests are implicated. See *ante*, at 518 (recognizing "conflict between interests of the highest order"); *ante*, at 533 ("important interests to be considered on *both* sides of the constitutional calculus"); *ante*, at 534 ("balanc[ing]" the interest in privacy "against the in-

terest in publishing matters of public importance"); *ante,* at 534 (privacy interest outweighed in these cases).

The statutory restrictions before us directly enhance private speech. See *Harper & Row, Publishers, Inc.* v. *Nation Enterprises,* 471 U. S. 539, 559 (1985) (describing " 'freedom *not* to speak publicly' " (quoting *Estate of Hemingway* v. *Random House, Inc.,* 23 N. Y. 2d 341, 348, 244 N. E. 2d 250, 255 (1968))). The statutes ensure the privacy of telephone conversations much as a trespass statute ensures privacy within the home. That assurance of privacy helps to overcome our natural reluctance to discuss private matters when we fear that our private conversations may become public. And the statutory restrictions consequently encourage conversations that otherwise might not take place.

At the same time, these statutes restrict public speech directly, deliberately, and of necessity. They include media publication within their scope not simply as a means, say, to deter interception, but also as an end. Media dissemination of an intimate conversation to an entire community will often cause the speakers serious harm over and above the harm caused by an initial disclosure to the person who intercepted the phone call. See *Gelbard* v. *United States,* 408 U. S. 41, 51–52 (1972). And the threat of that widespread dissemination can create a far more powerful disincentive to speak privately than the comparatively minor threat of disclosure to an interceptor and perhaps to a handful of others. Insofar as these statutes protect private communications against that widespread dissemination, they resemble laws that would award damages caused through publication of information obtained by theft from a private bedroom. See generally Warren & Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193 (1890) (hereinafter Warren & Brandeis). See also Restatement (Second) of Torts § 652D (1977).

As a general matter, despite the statutes' direct restrictions on speech, the Federal Constitution must tolerate

laws of this kind because of the importance of these privacy and speech-related objectives. See Warren & Brandeis 196 (arguing for state-law protection of the right to privacy). Cf. *Katz* v. *United States,* 389 U. S. 347, 350–351 (1967) ("[T]he protection of a person's *general* right to privacy—his right to be let alone by other people—is, like the protection of his property and of his very life, left largely to the law of the individual States"); *ante,* at 518 (protecting privacy and promoting speech are "interests of the highest order"). Rather than broadly forbid this kind of legislative enactment, the Constitution demands legislative efforts to tailor the laws in order reasonably to reconcile media freedom with personal, speech-related privacy.

Nonetheless, looked at more specifically, the statutes, as applied in these circumstances, do not reasonably reconcile the competing constitutional objectives. Rather, they disproportionately interfere with media freedom. For one thing, the broadcasters here engaged in no unlawful activity other than the ultimate publication of the information another had previously obtained. They "neither encouraged nor participated directly or indirectly in the interception." App. to Pet. for Cert. in No. 99–1687, p. 33a. See also *ante,* at 525. No one claims that they ordered, counseled, encouraged, or otherwise aided or abetted the interception, the later delivery of the tape by the interceptor to an intermediary, or the tape's still later delivery by the intermediary to the media. Cf. 18 U. S. C. § 2 (criminalizing aiding and abetting any federal offense); 2 W. LaFave & A. Scott, Substantive Criminal Law §§ 6.6(b)–(c), pp. 128–129 (1986) (describing criminal liability for aiding and abetting). And, as the Court points out, the statutes do not forbid the receipt of the tape itself. *Ante,* at 525. The Court adds that its holding "does not apply to punishing parties for obtaining the relevant information *unlawfully.*" *Ante,* at 532, n. 19 (emphasis added).

For another thing, the speakers had little or no *legitimate* interest in maintaining the privacy of the particular conversation. That conversation involved a suggestion about "blow[ing] off . . . front porches" and "do[ing] some work on some of those guys," App. 46, thereby raising a significant concern for the safety of others. Where publication of private information constitutes a wrongful act, the law recognizes a privilege allowing the reporting of threats to public safety. See Restatement (Second) of Torts § 595, Comment *g* (1977) (general privilege to report that "another intends to kill or rob or commit some other serious crime against a third person"); *id.*, § 652G (privilege applies to invasion of privacy tort). Cf. Restatement (Third) of Unfair Competition § 40, Comment *c* (1995) (trade secret law permits disclosures relevant to public health or safety, commission of crime or tort, or other matters of substantial public concern); *Lachman* v. *Sperry-Sun Well Surveying Co.*, 457 F. 2d 850, 853 (CA10 1972) (nondisclosure agreement not binding in respect to criminal activity); *Tarasoff* v. *Regents of Univ. of Cal.*, 17 Cal. 3d 425, 436, 551 P. 2d 334, 343–344 (1976) (psychiatric privilege not binding in presence of danger to self or others). Even where the danger may have passed by the time of publication, that fact cannot legitimize the speaker's earlier privacy expectation. Nor should editors, who must make a publication decision quickly, have to determine present or continued danger before publishing this kind of threat.

Further, the speakers themselves, the president of a teacher's union and the union's chief negotiator, were "limited public figures," for they voluntarily engaged in a public controversy. They thereby subjected themselves to somewhat greater public scrutiny and had a lesser interest in privacy than an individual engaged in purely private affairs. See, *e. g.*, *ante*, at 535 (respondents were engaged in matter of public concern); *Wolston* v. *Reader's Digest Assn., Inc.*, 443

U. S. 157, 164 (1979); *Hutchinson* v. *Proxmire*, 443 U. S. 111, 134 (1979); *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 351 (1974). See also Warren & Brandeis 215.

This is not to say that the Constitution requires anyone, including public figures, to give up entirely the right to private communication, *i. e.*, communication free from telephone taps or interceptions. But the subject matter of the conversation at issue here is far removed from that in situations where the media publicizes truly private matters. See *Michaels* v. *Internet Entertainment Group, Inc.*, 5 F. Supp. 2d 823, 841–842 (CD Cal. 1998) (broadcast of videotape recording of sexual relations between famous actress and rock star not a matter of legitimate public concern); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser & Keeton on Law of Torts § 117, p. 857 (5th ed. 1984) (stating that there is little expectation of privacy in mundane facts about a person's life, but that "portrayal of . . . intimate private characteristics or conduct" is "quite a different matter"); Warren & Brandeis 214 (recognizing that in certain matters "the community has no legitimate concern"). Cf. *Time, Inc.* v. *Firestone*, 424 U. S. 448, 454–455 (1976) (despite interest of public, divorce of wealthy person not a "public controversy"). Cf. also *ante*, at 533 ("[S]ome intrusions on privacy are more offensive than others").

Thus, in finding a constitutional privilege to publish unlawfully intercepted conversations of the kind here at issue, the Court does not create a "public interest" exception that swallows up the statutes' privacy-protecting general rule. Rather, it finds constitutional protection for publication of intercepted information of a special kind. Here, the speakers' legitimate privacy expectations are unusually low, and the public interest in defeating those expectations is unusually high. Given these circumstances, along with the lawful nature of respondents' behavior, the statutes' enforcement would disproportionately harm media freedom.

I emphasize the particular circumstances before us because, in my view, the Constitution permits legislatures to respond flexibly to the challenges future technology may pose to the individual's interest in basic personal privacy. Clandestine and pervasive invasions of privacy, unlike the simple theft of documents from a bedroom, are genuine possibilities as a result of continuously advancing technologies. Eavesdropping on ordinary cellular phone conversations in the street (which many callers seem to tolerate) is a very different matter from eavesdropping on encrypted cellular phone conversations or those carried on in the bedroom. But the technologies that allow the former may come to permit the latter. And statutes that may seem less important in the former context may turn out to have greater importance in the latter. Legislatures also may decide to revisit statutes such as those before us, creating better tailored provisions designed to encourage, for example, more effective privacy-protecting technologies.

For these reasons, we should avoid adopting overly broad or rigid constitutional rules, which would unnecessarily restrict legislative flexibility. I consequently agree with the Court's holding that the statutes as applied here violate the Constitution, but I would not extend that holding beyond these present circumstances.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA and JUSTICE THOMAS join, dissenting.

Technology now permits millions of important and confidential conversations to occur through a vast system of electronic networks. These advances, however, raise significant privacy concerns. We are placed in the uncomfortable position of not knowing who might have access to our personal and business e-mails, our medical and financial records, or our cordless and cellular telephone conversations. In an attempt to prevent some of the most egregious violations of privacy, the United States, the District of Columbia,

and 40 States have enacted laws prohibiting the intentional interception and knowing disclosure of electronic communications.[1] The Court holds that all of these statutes violate the First Amendment insofar as the illegally intercepted conversation touches upon a matter of "public concern," an amorphous concept that the Court does not even attempt to define. But the Court's decision diminishes, rather than enhances, the purposes of the First Amendment, thereby chilling the speech of the millions of Americans who rely upon electronic technology to communicate each day.

Over 30 years ago, with Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Congress recognized that the

"tremendous scientific and technological developments that have taken place in the last century have made possible today the widespread use and abuse of elec-

---

[1] See 18 U. S. C. § 2511(1) (1994 ed. and Supp. V); Ala. Code § 13A–11–30 *et seq.* (1994); Alaska Stat. Ann. § 42.20.300(d) (2000); Ark. Code Ann. § 5–60–120 (1997); Cal. Penal Code Ann. § 631 (West 1999); Colo. Rev. Stat. § 18–9–303 (2000); Del. Code Ann., Tit. 11, § 1336(b)(1) (1995); D. C. Code Ann. § 23–542 (1996); Fla. Stat. § 934.03(1) (Supp. 2001); Ga. Code Ann. § 16–11–66.1 (1996); Haw. Rev. Stat. § 803–42 (1993); Idaho Code § 18–6702 (1997); Ill. Comp. Stat., ch. 720, § 5/14–2(b) (1999 Supp.); Iowa Code § 808B.2 (1994); Kan. Stat. Ann. § 21–4002 (1995); Ky. Rev. Stat. Ann. § 526.060 (Michie 1999); La. Rev. Stat. Ann. § 15:1303 (West 1992); Me. Rev. Stat. Ann., Tit. 15, § 710(3) (Supp. 2000); Md. Cts. & Jud. Proc. Code Ann. § 10–402 (Supp. 2000); Mass. Gen. Laws § 272:99(C)(3) (1997); Mich. Comp. Laws Ann. § 750.539e (West 1991); Minn. Stat. § 626A.02 (2000); Mo. Rev. Stat. § 542.402 (2000); Neb. Rev. Stat. § 86–702 (1999); Nev. Rev. Stat. § 200.630 (1995); N. H. Rev. Stat. Ann. § 570–A:2 (Supp. 2000); N. J. Stat. Ann. § 2A:156A–3 (West Supp. 2000); N. M. Stat. Ann. § 30–12–1 (1994); N. C. Gen. Stat. § 15A–287 (1999); N. D. Cent. Code § 12.1–15–02 (1997); Ohio Rev. Code Ann. § 2933.52(A)(3) (1997); Okla. Stat., Tit. 13, § 176.3 (2000 Supp.); Ore. Rev. Stat. § 165.540 (1997); 18 Pa. Cons. Stat. § 5703 (2000); R. I. Gen. Laws § 11–35–21 (2000); Tenn. Code Ann. § 39–13–601 (1997); Tex. Penal Code Ann. § 16.02 (Supp. 2001); Utah Code Ann. § 77–23a–4 (1982); Va. Code Ann. § 19.2–62 (1995); W. Va. Code § 62–1D–3 (2000); Wis. Stat. § 968.31(1) (1994); Wyo. Stat. Ann. § 7–3–602 (1995).

tronic surveillance techniques. As a result of these developments, privacy of communication is seriously jeopardized by these techniques of surveillance. . . . No longer is it possible, in short, for each man to retreat into his home and be left alone. Every spoken word relating to each man's personal, marital, religious, political, or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the auditor's advantage." S. Rep. No. 1097, 90th Cong., 2d Sess., 67 (1968) (hereinafter S. Rep. No. 1097).

This concern for privacy was inseparably bound up with the desire that personal conversations be frank and uninhibited, not cramped by fears of clandestine surveillance and purposeful disclosure:

"In a democratic society privacy of communication is essential if citizens are to think and act creatively and constructively. Fear or suspicion that one's speech is being monitored by a stranger, even without the reality of such activity, can have a seriously inhibiting effect upon the willingness to voice critical and constructive ideas." President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 202 (1967).

To effectuate these important privacy and speech interests, Congress and the vast majority of States have proscribed the intentional interception and knowing disclosure of the contents of electronic communications.[2] See, e. g., 18 U. S. C. § 2511(1)(c) (placing restrictions upon "any person who . . . intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic commu-

---

[2] "Electronic communication" is defined as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system." 18 U. S. C. § 2510(12) (1994 ed., Supp. V).

nication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication").

The Court correctly observes that these are "content-neutral law[s] of general applicability" which serve recognized interests of the "highest order": "the interest in individual privacy and . . . in fostering private speech." *Ante,* at 526, 518. It nonetheless subjects these laws to the strict scrutiny normally reserved for governmental attempts to censor different viewpoints or ideas. See *ante,* at 532 (holding that petitioners have not established the requisite " 'need . . . of the highest order' ") (quoting *Smith* v. *Daily Mail Publishing Co.,* 443 U. S. 97, 103 (1979)). There is scant support, either in precedent or in reason, for the Court's tacit application of strict scrutiny.

A content-neutral regulation will be sustained if

> " 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.' " *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 662 (1994) (quoting *United States* v. *O'Brien,* 391 U. S. 367, 377 (1968)).

Here, Congress and the Pennsylvania Legislature have acted " 'without reference to the content of the regulated speech.' " *Renton* v. *Playtime Theatres, Inc.,* 475 U. S. 41, 48 (1986). There is no intimation that these laws seek "to suppress unpopular ideas or information or manipulate the public debate" or that they "distinguish favored speech from disfavored speech on the basis of the ideas or views expressed." *Turner Broadcasting, supra,* at 641, 643. The antidisclosure provision is based solely upon the manner in which the conversation was acquired, not the subject matter of the conversation or the viewpoints of the speakers. The same

information, if obtained lawfully, could be published with impunity. Cf. *Seattle Times Co.* v. *Rhinehart,* 467 U. S. 20, 34 (1984) (upholding under intermediate scrutiny a protective order on information acquired during discovery in part because "the party may disseminate the identical information . . . as long as the information is gained through means independent of the court's processes"). As the concerns motivating strict scrutiny are absent, these content-neutral restrictions upon speech need pass only intermediate scrutiny.

The Court's attempt to avoid these precedents by reliance upon the *Daily Mail* string of newspaper cases is unpersuasive. In these cases, we held that statutes prohibiting the media from publishing certain truthful information—the name of a rape victim, *Florida Star* v. *B. J. F.,* 491 U. S. 524 (1989); *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469 (1975), the confidential proceedings before a state judicial review commission, *Landmark Communications, Inc.* v. *Virginia,* 435 U. S. 829 (1978), and the name of a juvenile defendant, *Daily Mail, supra; Oklahoma Publishing Co.* v. *District Court, Oklahoma Cty.,* 430 U. S. 308 (1977) *(per curiam)*— violated the First Amendment. In so doing, we stated that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Daily Mail, supra,* at 103. Neither this *Daily Mail* principle nor any other aspect of these cases, however, justifies the Court's imposition of strict scrutiny here.

Each of the laws at issue in the *Daily Mail* cases regulated the content or subject matter of speech. This fact alone was enough to trigger strict scrutiny, see *United States* v. *Playboy Entertainment Group, Inc.,* 529 U. S. 803, 813 (2000) ("[A] content-based speech restriction . . . can stand only if it satisfies strict scrutiny"), and suffices to distinguish these antidisclosure provisions. But, as our synthesis of these

cases in *Florida Star* made clear, three other unique factors also informed the scope of the *Daily Mail* principle.

First, the information published by the newspapers had been lawfully obtained from the government itself.[3] "Where information is entrusted to the government, a less drastic means than punishing truthful publication almost always exists for guarding against the dissemination of private facts." *Florida Star, supra,* at 534. See, *e. g., Landmark Communications, supra,* at 841, and n. 12 (noting that the State could have taken steps to protect the confidentiality of its proceedings, such as holding in contempt commission members who breached their duty of confidentiality). Indeed, the State's ability to control the information undermined the claim that the restriction was necessary, for "[b]y placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served." *Cox Broadcasting, supra,* at 495. This factor has no relevance in the present cases, where we deal with private conversations that have been intentionally kept out of the public domain.

Second, the information in each case was already "publicly available," and punishing further dissemination would not have advanced the purported government interests of confidentiality. *Florida Star, supra,* at 535. Such is not the case here. These statutes only prohibit "disclos[ure]," 18 U. S. C. § 2511(1)(c); 18 Pa. Cons. Stat. § 5703(2) (2000), and one cannot "disclose" what is already in the public domain. See Black's Law Dictionary 477 (7th ed. 1999) (defining "disclosure" as "[t]he act or process of making known something that was previously unknown; a revelation of facts");

---

[3] The one exception was *Daily Mail,* where reporters obtained the juvenile defendant's name from witnesses to the crime. See 443 U. S., at 99. However, the statute at issue there imposed a blanket prohibition on the publication of the information. See *id.,* at 98–99. In contrast, these antidisclosure provisions do not prohibit publication so long as the information comes from a legal source.

S. Rep. No. 1097, at 93 ("The disclosure of the contents of an intercepted communication that had already become 'public information' or 'common knowledge' would not be prohibited"). These laws thus do not fall under the axiom that "the interests in privacy fade when the information involved already appears on the public record." *Cox Broadcasting, supra,* at 494–495.

Third, these cases were concerned with "the 'timidity and self-censorship' which may result from allowing the media to be punished for publishing certain truthful information." *Florida Star,* 491 U. S., at 535. But fear of "timidity and self-censorship" is a basis for upholding, not striking down, these antidisclosure provisions: They allow private conversations to transpire without inhibition. And unlike the statute at issue in *Florida Star,* which had no scienter requirement, see *id.,* at 539, these statutes only address those who *knowingly* disclose an illegally intercepted conversation.[4] They do not impose a duty to inquire into the source of the information and one could negligently disclose the contents of an illegally intercepted communication without liability.

In sum, it is obvious that the *Daily Mail* cases upon which the Court relies do not address the question presented here. Our decisions themselves made this clear: "The *Daily Mail* principle does not settle the issue whether, in cases where information has been acquired *unlawfully* by a newspaper or by a source, government may ever punish not only the unlawful acquisition, but the ensuing publication as well." *Florida Star, supra,* at 535, n. 8; see also *Daily Mail,* 443 U. S., at 105 ("Our holding in this case is narrow. There is no issue before us of unlawful press [conduct]"); *Landmark*

---

[4] In 1986, to ensure that only the most culpable could face liability for disclosure, Congress increased the scienter requirement from "willful" to "intentional." 18 U. S. C. §2511(1)(c); see also S. Rep. No. 99–541, p. 6 (1986) ("In order to underscore that the inadvertent reception of a protected communication is not a crime, the subcommittee changed the state of mind requirement under [Title III] from 'willful' to 'intentional'").

*Communications,* 435 U. S., at 837 ("We are not here concerned with the possible applicability of the statute to one who secures the information by illegal means and thereafter divulges it").[5]

Undaunted, the Court places an inordinate amount of weight upon the fact that the receipt of an illegally intercepted communication has not been criminalized. See *ante,* at 528–532. But this hardly renders those who knowingly receive and disclose such communications "law-abiding," *ante,* at 529, and it certainly does not bring them under the *Daily Mail* principle. The transmission of the intercepted communication from the eavesdropper to the third party is itself illegal; and where, as here, the third party then knowingly discloses that communication, another illegal act has been committed. The third party in this situation cannot be likened to the reporters in the *Daily Mail* cases, who lawfully obtained their information through consensual interviews or public documents.

These laws are content neutral; they only regulate information that was illegally obtained; they do not restrict republication of what is already in the public domain; they impose no special burdens upon the media; they have a scienter requirement to provide fair warning; and they promote the privacy and free speech of those using cellular telephones. It is hard to imagine a more narrowly tailored prohibition of the disclosure of illegally intercepted communications, and it distorts our precedents to review these statutes under the often fatal standard of strict scrutiny. These laws therefore should be upheld if they further a sub-

---

[5] Tellingly, we noted in *Florida Star* that "[t]o the extent sensitive information rests in private hands, the government may under some circumstances forbid its nonconsensual acquisition, thereby bringing outside of the *Daily Mail* principle the publication of any information so acquired." 491 U. S., at 534; see also *id.,* at 535 ("[I]t is highly anomalous to sanction persons other than the source of [the] release").

549

stantial governmental interest unrelated to the suppression of free speech, and they do.

Congress and the overwhelming majority of States reasonably have concluded that sanctioning the knowing disclosure of illegally intercepted communications will deter the initial interception itself, a crime which is extremely difficult to detect. It is estimated that over 20 million scanners capable of intercepting cellular transmissions currently are in operation, see Thompson, Cell Phone Snooping: Why Electronic Eavesdropping Goes Unpunished, 35 Am. Crim. L. Rev. 137, 149 (1997), notwithstanding the fact that Congress prohibited the marketing of such devices eight years ago, see 47 U. S. C. § 302a(d).[6] As Congress recognized, "[a]ll too often the invasion of privacy itself will go unknown. Only by striking at all aspects of the problem can privacy be adequately protected." S. Rep. No. 1097, at 69. See also Hearings on H. R. 3378 before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 99th Cong., 1st Sess. and 2d Sess., 290 (1986) ("Congress should be under no illusion . . . that the Department [of Justice], because of the difficulty of such investigations, would be able to bring a substantial number of successful prosecutions").

Nonetheless, the Court faults Congress for providing "no empirical evidence to support the assumption that the prohibition against disclosures reduces the number of illegal interceptions," *ante*, at 530–531, and insists that "there is no basis for assuming that imposing sanctions upon respondents will deter the unidentified scanner from contin-

---

[6] The problem is pervasive because legal "radio scanners [may be] modified to intercept cellular calls." S. Rep. No. 99–541, at 9. For example, the scanner at issue in *Boehner* v. *McDermott*, 191 F. 3d 463 (CADC 1999), had been recently purchased at Radio Shack. See Thompson, 35 Am. Crim. L. Rev., at 152, and n. 138 (citing Stratton, Scanner Wasn't Supposed to Pick up Call, But it Did, Orlando Sentinel, Jan. 18, 1997, p. A15).

uing to engage in surreptitious interceptions," *ante,* at 531. It is the Court's reasoning, not the judgment of Congress and numerous States regarding the necessity of these laws, which disappoints.

The "quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 391 (2000). "[C]ourts must accord substantial deference to the predictive judgments of Congress." *Turner Broadcasting,* 512 U. S., at 665 (citing *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 103 (1973)). This deference recognizes that, as an institution, Congress is far better equipped than the judiciary to evaluate the vast amounts of data bearing upon complex issues and that "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Turner Broadcasting,* 512 U. S., at 665. Although we must nonetheless independently evaluate such congressional findings in performing our constitutional review, this "is not a license to reweigh the evidence *de novo,* or to replace Congress' factual predictions with our own." *Id.,* at 666.

The "dry-up-the-market" theory, which posits that it is possible to deter an illegal act that is difficult to police by preventing the wrongdoer from enjoying the fruits of the crime, is neither novel nor implausible. It is a time-tested theory that undergirds numerous laws, such as the prohibition of the knowing possession of stolen goods. See 2 W. LaFave & A. Scott, Substantive Criminal Law § 8.10(a), p. 422 (1986) ("Without such receivers, theft ceases to be profitable. It is obvious that the receiver must be a principal target of any society anxious to stamp out theft in its various forms"). We ourselves adopted the exclusionary

rule based upon similar reasoning, believing that it would "deter unreasonable searches," *Oregon* v. *Elstad*, 470 U. S. 298, 306 (1985), by removing an officer's "incentive to disregard [the Fourth Amendment]," *Elkins* v. *United States*, 364 U. S. 206, 217 (1960).[7]

The same logic applies here and demonstrates that the incidental restriction on alleged First Amendment freedoms is no greater than essential to further the interest of protecting the privacy of individual communications. Were there no prohibition on disclosure, an unlawful eavesdropper who wanted to disclose the conversation could anonymously launder the interception through a third party and thereby avoid detection. Indeed, demand for illegally obtained private information would only increase if it could be disclosed without repercussion. The law against interceptions, which the Court agrees is valid, would be utterly ineffectual without these antidisclosure provisions.

For a similar reason, we upheld against First Amendment challenge a law prohibiting the distribution of child pornography. See *New York* v. *Ferber*, 458 U. S. 747 (1982). Just as with unlawfully intercepted electronic communications, we there noted the difficulty of policing the "low-profile, clandestine industry" of child pornography production and concurred with 36 legislatures that "[t]he most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product." *Id.*, at 760. In so doing, we did not demand, nor did Congress provide, any empirical

---

[7] In crafting the exclusionary rule, we did not first require empirical evidence. See *Elkins*, 364 U. S., at 218 ("Empirical statistics are not available to show that the inhabitants of states which follow the exclusionary rule suffer less from lawless searches and seizures than do those of states which admit evidence unlawfully obtained"). When it comes to this Court's awesome power to strike down an Act of Congress as unconstitutional, it should not be "do as we say, not as we do."

evidence to buttress this basic syllogism. Indeed, we re-affirmed the theory's vitality in *Osborne* v. *Ohio*, 495 U. S. 103, 109–110 (1990), finding it "surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand."[8]

At base, the Court's decision to hold these statutes unconstitutional rests upon nothing more than the bald substitution of its own prognostications in place of the reasoned judgment of 41 legislative bodies and the United States Congress.[9] The Court does not explain how or from where Congress should obtain statistical evidence about the effectiveness of these laws, and "[s]ince as a practical matter it is never easy to prove a negative, it is hardly likely that conclusive factual data could ever be assembled." *Elkins, supra,* at 218. Reliance upon the "dry-up-the-market" the-

---

[8] The Court attempts to distinguish *Ferber* and *Osborne* on the ground that they involved low-value speech, but this has nothing to do with the reasonableness of the "dry-up-the-market" theory. The Court also posits that Congress here could simply have increased the penalty for intercepting cellular communications. See *ante,* at 529. But the Court's back-seat legislative advice does nothing to undermine the reasonableness of Congress' belief that prohibiting only the initial interception would not effectively protect the privacy interests of cellular telephone users.

[9] The Court observes that in many of the cases litigated under § 2511(1), "the person or persons intercepting the communication ha[ve] been known." *Ante,* at 530. Of the 206 cases cited in the appendices, 143 solely involved § 2511(1)(a) claims of wrongful interception—*disclosure* was not at issue. It is of course unremarkable that intentional *interception* cases have not been pursued where the identity of the eavesdropper was unknown. Of the 61 disclosure and use cases with published facts brought under §§ 2511(1)(c) and (d), 9 involved an unknown or unproved eavesdropper, 1 involved a lawful pen register, and 5 involved recordings that were not surreptitious. Thus, as relevant, 46 disclosure cases involved known eavesdroppers. Whatever might be gleaned from this figure, the Court is practicing voodoo statistics when it states that it undermines the "dry-up-the-market" theory. See *ante,* at 531, n. 17. These cases say absolutely nothing about the interceptions and disclosures that have been *deterred.*

ory is both logical and eminently reasonable, and our precedents make plain that it is "far stronger than mere speculation." *United States* v. *Treasury Employees,* 513 U. S. 454, 475 (1995).

These statutes also protect the important interests of deterring clandestine invasions of privacy and preventing the involuntary broadcast of private communications. Over a century ago, Samuel Warren and Louis Brandeis recognized that "[t]he intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual." The Right to Privacy, 4 Harv. L. Rev. 193, 196 (1890). "There is necessarily, and within suitably defined areas, a . . . freedom *not* to speak publicly, one which serves the same ultimate end as freedom of speech in its affirmative aspect." *Harper & Row, Publishers, Inc.* v. *Nation Enterprises,* 471 U. S. 539, 559 (1985) (internal quotation marks and citation omitted). One who speaks into a phone "is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world." *Katz* v. *United States,* 389 U. S. 347, 352 (1967); cf. *Gelbard* v. *United States,* 408 U. S. 41, 52 (1972) (compelling testimony about matters obtained from an illegal interception at a grand jury proceeding "compounds the statutorily proscribed invasion of . . . privacy by adding to the injury of the interception the insult of . . . disclosure").

These statutes undeniably protect this venerable right of privacy. Concomitantly, they further the First Amendment rights of the parties to the conversation. "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting,* 512 U. S., at 641. By "protecting the privacy of individual thought and expression," *United States*

v. *United States Dist. Court for Eastern Dist. of Mich.*, 407 U. S. 297, 302 (1972), these statutes further the "uninhibited, robust, and wide-open" speech of the private parties, *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964). Unlike the laws at issue in the *Daily Mail* cases, which served only to protect the identities and actions of a select group of individuals, these laws protect millions of people who communicate electronically on a daily basis. The chilling effect of the Court's decision upon these private conversations will surely be great: An estimated 49.1 million analog cellular telephones are currently in operation. See Hao, Nokia Profits from Surge in Cell Phones, Fla. Today, July 18, 1999, p. E1.

Although the Court recognizes and even extols the virtues of this right to privacy, see *ante*, at 532–533, these are "mere words," W. Shakespeare, Troilus and Cressida, act v, sc. 3, overridden by the Court's newfound right to publish unlawfully acquired information of "public concern," *ante*, at 525. The Court concludes that the private conversation between Gloria Bartnicki and Anthony Kane is somehow a "debate . . . . worthy of constitutional protection." *Ante*, at 535. Perhaps the Court is correct that "[i]f the statements about the labor negotiations had been made in a public arena—during a bargaining session, for example— they would have been newsworthy." *Ante*, at 525. The point, however, is that Bartnicki and Kane had no intention of contributing to a public "debate" at all, and it is perverse to hold that another's unlawful interception and knowing disclosure of their conversation is speech "worthy of constitutional protection." Cf. *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 573 (1995) ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say' "). The Constitution should not protect the involuntary broadcast of personal conversations. Even where the communications involve public figures or

concern public matters, the conversations are nonetheless private and worthy of protection. Although public persons may have forgone the right to live their lives screened from public scrutiny in some areas, it does not and should not follow that they also have abandoned their right to have a private conversation without fear of it being intentionally intercepted and knowingly disclosed.

The Court's decision to hold inviolable our right to broadcast conversations of "public importance" enjoys little support in our precedents. As discussed above, given the qualified nature of their holdings, the *Daily Mail* cases cannot bear the weight the Court places upon them. More mystifying still is the Court's reliance upon the "Pentagon Papers" case, *New York Times Co.* v. *United States*, 403 U. S. 713 (1971) *(per curiam)*, which involved the United States' attempt to prevent the publication of Defense Department documents relating to the Vietnam War. In addition to involving Government controlled information, that case fell squarely under our precedents holding that prior restraints on speech bear "'a heavy presumption against . . . constitutionality.'" *Id.*, at 714. Indeed, it was this presumption that caused Justices Stewart and White to join the 6-to-3 *per curiam* decision. See *id.*, at 730–731 (White, J., joined by Stewart, J., concurring) ("I concur in today's judgments, but only because of the concededly extraordinary protection against prior restraints enjoyed by the press under our constitutional system"). By no stretch of the imagination can the statutes at issue here be dubbed "prior restraints." And the Court's "parallel reasoning" from other inapposite cases fails to persuade. *Ante*, at 535.

Surely "the interest in individual privacy," *ante*, at 518, at its narrowest, must embrace the right to be free from surreptitious eavesdropping on, and involuntary broadcast of, our cellular telephone conversations. The Court subordinates that right, not to the claims of those who themselves wish to speak, but to the claims of those who wish to

556

publish the intercepted conversations of others. Congress' effort to balance the above claim to privacy against a marginal claim to speak freely is thereby set at naught.