In the Matter of the Application of the **UNITED STATES FOR AN ORDER AUTHORIZING THE ROVING INTERCEPTION OF ORAL COMMUNICATIONS,**

**The Company, Appellant,**

v.

**United States of America, Appellee.**

No. 02–15635.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 2, 2002.

Filed Nov. 18, 2003.

Bennee B. Jones, Andrews & Kurth LLP, Dallas, TX, for the appellant.

Eric Johnson, Senior Litigation Counsel, and Kathleen Bliss, Assistant United States Attorney, Organized Crime Strike Force, Office of the United States Attorney, Las Vegas, NV, for the appellee.

Before: NOONAN, BERZON, and TALLMAN, Circuit Judges.

Opinion by Judge BERZON. Dissent by Judge TALLMAN.

## OPINION

BERZON, Circuit Judge:

Giving new meaning to the automotive advertising slogans "The Ultimate Driving Machine"[1] and "We've Got You Covered,"[2] some luxury cars are now equipped with telecommunication devices that provide a set of innovative services to car owners. These on-board systems assist drivers in activities from the mundane—such as navigating an unfamiliar neighborhood or finding a nearby Chinese restaurant—to the more vital—such as responding to emergencies or obtaining road-side assistance. Such systems operate via a combination of GPS (global positioning system, using satellite technology) and cellular technology. The appellant ("the Company") runs one such service ("the System").

One feature of the System allows the Company to open a cellular connection to a vehicle and listen to oral communications within the car. This feature is part of a stolen vehicle recovery mode that provides assistance to car owners and law enforce-

---

1. Slogan for BMW. *See* http://www.bmw.com.

2. Slogan for Cadillac. *See* http://www.cadillac.com/cadillacjsp/models/deville/index.html.

ment authorities in locating and retrieving stolen cars. The same technology that permits the interception of the conversations of thieves absconding with the car also permits eavesdropping on conversations within the vehicle.

The Federal Bureau of Investigation ("FBI"), realizing that the System can be used as a roving "bug" and following the procedures mandated for "bugging" private individuals suspected of criminal activity, sought and obtained a series of court orders requiring the Company to assist in intercepting conversations taking place in a car equipped with the System. The Company challenges the court's authority to order the use of the Company's equipment, facilities, system, and employees. The question for decision is whether the statute governing private parties' obligations to assist the federal government in intercepting communications permits such an order.

## I

### A. *The System*

The physical components that permit the System to operate are manufactured by an independent company but installed by the car maker. The car maker then subcontracts with the Company for the provision of the service aspects of the System. When a new car is purchased, owners have the option to subscribe, for a fee, to the System. The System is serviced by two different call centers, one of which is operated by the Company.

A national cellular telephone company provides the cellular airtime for the System and sends bills in batches to the Company. The Company then "forwards" these bills to its customers. It is our understanding from oral argument that the Company includes the cellular phone charges on its own bill sent out to its customers rather than sending on the cellular phone company's bill, but the record is not clear on this matter. Customers write only a single check, payable to the Company, for all System-related fees, including cellular airtime. The System does not allow users to make traditional cellular telephone calls; it only permits a user to communicate with one of the two designated call centers.

Each System console has three buttons: (1) an emergency button, which routes customers' calls to the Company; (2) an information button, which routes customers' calls to the other company that assists the customer with navigation; and (3) the roadside assistance button, which routes customers' calls to the other company for assistance in getting on-site service for vehicles.[3] The System automatically contacts the Company if an airbag deploys or the vehicle's supplemental restraint system activates.

If a customer's car is stolen and the customer verifies the theft, the customer can ask the Company to put the car into stolen vehicle recovery mode. Once the car is in this mode, the Company sends a signal to the car's System. The signal is sent continuously until the car responds or until the Company deactivates the mode. If the System has cellular reception and the engine is running, the System will automatically call the Company. The call will be directed to the next available operator. The Company maintains that it cannot determine when such a call will be made from the car or direct the call to a specific operator.

Once the call from the System is answered, the operator and anyone else lis-

---

**3.** If a customer has never used the System before or the account is otherwise not activated, the selection of the roadside assistance or information buttons will automatically route the call to the Company.

tening in can hear sound from inside the vehicle. Occupants of the vehicle will not know of the cellular phone connection and will be unaware of the eavesdropping.[4] The connection remains active until the driver turns off the ignition or loses cellular reception, or the Company disconnects the call. The System returns to normal when the Company deactivates vehicle recovery mode. At this point, one of two things happens: (1) if the radio in the vehicle is on, it will be muted and its screen will display a message saying "[System] Active;" or (2) if the radio is not on, the System will emit a beeping tone, regardless of whether the vehicle is on at the time. There is no way to prevent such signals that the car has been in recovery mode from reaching the customer.

When the System is in stolen vehicle recovery mode, the customer cannot use any of the other System services. If a customer presses any of the non-emergency buttons—for example, the roadside assistance or information buttons—nothing will happen. If the customer presses the emergency button or the airbags deploy while the recovery mode is enabled, it appears to the user that the system is attempting to open up a cellular phone connection to the response center but it is not. Instead, an audio tone is sent over the already open connection. The Company is concerned that if no operator is on the line and only the FBI is listening in, there will be no response to the subscriber's emergency signaled by the transmitted tone.

### B. *This Case*

Upon request by the FBI, the district court issued several ex parte orders pursu-

ant to 18 U.S.C. § 2518(4),[5] requiring the Company to assist in intercepting oral communications occurring in a certain vehicle equipped with the System. The Company complied with the first thirty-day order but not the next. After the government filed a Motion to Compel and for Contempt, the Company responded and filed motions for reconsideration and to quash or modify the court's order. The district court held an evidentiary hearing, denied the government's contempt motion, and ordered the Company to comply with the contested order. The Company has since complied with all subsequent court orders. In explaining its order, the district court found that "[The Company] is a 'telecommunications carrier' and 'provider of wire or electronic communication service' within the scope of 18 U.S.C. § 2518(4) and § 2522;" that the FBI request and the court order were not "unreasonably burdensome," that the Company's due process rights had not been violated; and that no "taking" had occurred.[6]

The district court ordered two further, similar ex parte interception orders, and the Company both contested and complied with each order. The district court then held a hearing on the Company's pending motions and denied them all. The Company now appeals from this denial.

### II

#### A. *Mootness*

■ Although the court orders requiring the Company to assist the FBI have now expired, the case readily fits the "capable of repetition, yet evading review" exception to the mootness doctrine.

The 'capable of repetition, yet evading review' exception to mootness applies

---

4. We do not decide, as it is not relevant to our discussion, whether such eavesdropping by the Company is permitted by title III if conducted without a court order. *See* § 2511.

5. All further citations are to 18 U.S.C., unless otherwise indicated.

6. Neither the takings nor the due process challenge has been continued on appeal.

only when (1) the challenged action is too short in duration to be fully litigated before cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again.

*Bernhardt v. County of L.A.*, 279 F.3d 862, 871–72 (9th Cir.2002) (quoting *Cole v. Oroville Union High Sch. Dist.*, 228·F.3d 1092, 1098 (9th Cir.2000)). Here, the relevant time period was too short for court review. Each court order was effective for thirty days, and the statute precludes orders of greater length. *See* § 2518(5).

Also, similar orders requiring the Company's cooperation are likely in the future. The government asserts that it will most probably seek orders to monitor oral communications in other vehicles containing the System. When there have been challenges to expired tracing and pen register[7] orders, courts have consistently found that they meet the capable of repetition, yet evading review exception. *See, e.g., N.Y. Tel. Co.*, 434 U.S. at 165 n. 6, 98 S.Ct. 364; *United States v. Mountain States Tel. & Tel. Co.*, 616 F.2d 1122, 1128 n. 5 (9th Cir.1980). We therefore conclude that the case is not moot.

## B. *Overview of 18 U.S.C. § 2518*

Section 2518 was first enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351(1968). Title III of the Act, Wiretapping and Electronic Surveillance, has the dual goals of: "(1) protecting the privacy of wire and oral communications, and (2) delineating on a uniform basis the circumstances and conditions under which the interception of wire and oral communica-

tions may be authorized." S.Rep. No. 90–1097, at 66 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2153. Title III therefore attempts to balance protecting the privacy interests of individuals with facilitating the investigation of crime, especially organized crime. Pub.L. No. 90–351, § 801 (1968); S.Rep. No. 90–1097, at 66–73, *reprinted in* 1968 U.S.C.C.A.N. at 2153–63; *see also Bartnicki v. Vopper*, 532 U.S. 514, 523–24, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001); *Dalia v. United States*, 441 U.S. 238, 252–53 & n. 13, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) (citing S.Rep. No. 90–1097, at 70); *United States v. Kalustian*, 529 F.2d 585, 588 (9th Cir. 1975); Clifford S. Fishman & Anne T. McKenna, Wiretapping and Eavesdropping § 1.6 (2d ed.1995).

> To assure the privacy of oral and wire communications, title III prohibits all wiretapping and electronic surveillance by persons other than duly authorized law enforcement officers.

S.Rep. No. 90–1097, at 66, *reprinted in* 1968 U.S.C.C.A.N. at 2153. Law enforcement officers may only intercept communications after receiving "the authorization of a court order obtained after a showing and finding of probable cause." *Id.* Any person who illegally intercepts oral, wire, or electronic communications is subject to civil and criminal penalties. §§ 2511 & 2520. The statute prohibits the admission of most evidence obtained in violation of title III. § 2518(10)(a).

The statute also has provided, since 1970, that certain enumerated entities and individuals must assist law enforcement in wiretapping or eavesdropping when directed by a court order to do so. *See* Pub.L.

---

**7.** Tracing allows law enforcement to determine the telephone numbers from which incoming calls originated. *See In re Application of the United States for Order Authorizing Installation of Pen Register, Touch-Tone Decoder, Terminating Trap*, 610 F.2d 1148, 1152–53 (3d Cir.1979).

"A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released. It does not overhear oral communications ...." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 161 n. 1, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977).

No. 91–358, § 211(b) (1970); § 2518(4).[8]
Presently, § 2518(4) requires:

> that a provider of wire or electronic communication service, landlord, custodian or other person shall furnish the [law enforcement] applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such service provider, landlord, custodian, or person is according the person whose communications are to be intercepted.

18 U.S.C. § 2518(4).

The question before us is: When may a company, not a common carrier [9] but possessing a unique ability to facilitate the interception of oral communications, be required to assist law enforcement in intercepting such communications?

### C. Application of § 2518(4) to the Company

The district court held that the Company was a "provider of wire or electronic communication service" and therefore obligated to assist the FBI under § 2518(4).[10] Determining whether the Company is so obligated under the statute is difficult, as the statutory language is complex.

### 1. Type of Communications Intercepted

Court orders in this case required the Company to assist the FBI in eavesdropping on conversations occurring inside a vehicle equipped with the System. An "oral communication" is defined in the Act, solipsistically, as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." § 2510(2); see also Price v. Turner, 260 F.3d 1144, 1147–48 (9th Cir.2001) (cordless telephone calls are not oral communications because the communication is made via radio waves). "In essence, an oral communication is one carried by sound waves, not by an electronic medium." S.Rep. No. 99–541, at 29 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3567. The communica-

---

8. The Omnibus Crime Control and Safe Streets Act did not originally provide explicitly for the enlisting of assistance for surveillance purposes. See Pub.L. No. 90–351 (1968). In 1970, the Ninth Circuit, in Application of the United States, 427 F.2d 639, 644 (9th Cir.1970), held that under title III a telephone company could not be ordered to assist law enforcement in intercepting a wire communication. Soon thereafter, § 2518 was amended to provide: "An order authorizing the interception of a wire or oral communication shall ... direct that a communication common carrier, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception ...." Pub.L. No. 91–358, § 211(b) (1970); see also H.R.Rep. No. 103–827, at 13 (1994), reprinted in 1994 U.S.C.C.A.N. 3489, 3493 (the 1970 amendment was in response to Application of the United States ); N.Y. Tel. Co., 434 U.S. at 177, 98 S.Ct. 364 (same).

9. "Common carriers" are entities that must provide service to the public without discrimination and are heavily regulated by the FCC. See 47 U.S.C. § 153(h); 47 U.S.C. § 201(a); FCC v. Midwest Video Corp., 440 U.S. 689, 701, 99 S.Ct. 1435, 59 L.Ed.2d 692(1979) (defining a common carrier as an entity that "makes a public offering to provide [communications facilities] whereby all members of the public who choose to employ such facilities may communicate or transmit intelligence of their own design and choosing") (internal quotation marks and citations omitted).

10. The district court also held that the Company was a "telecommunications carrier" within the meaning of § 2522. See also 47 U.S.C. § 1001(8) (defining telecommunications carrier). The government has not sought to sustain this holding on appeal. We therefore only analyze whether the Company could have been ordered to assist the FBI under the provisions of § 2518(4).

tions intercepted here were in-person voice communications, involving no means of transmission except for natural sound waves. Neither party disputes that the occupants of the vehicle reasonably expected that words spoken between them would be private, not subject to interception or transmission. The communications at issue therefore were "oral communications" within the ambit of the statute.

True, the FBI used wire communications via the System's cellular phone technology to intercept [11] the oral communications made within the vehicle.[12] The FBI, however, sought to intercept the oral communications between the occupants of the vehicle, not the wire communications between the vehicle's occupants and the Company. The manner in which the communication was intercepted does not change the fact that the FBI intercepted *oral* communications. As one House Report explained:

> [t]he definitions of wire communication and oral communication are not mutually exclusive. Accordingly, different aspects of the same communication might be differently characterized. For example, a person who overhears one end of a telephone conversation by listening in on the oral utterances of one of the parties is intercepting an oral communication. If the eavesdropper instead taps into the

telephone wire, he is intercepting a wire communication.

H. Rep. No. 99–647, at 34; *see also United States v. Borch,* 695 F.Supp. 898, 899, 901–02 (E.D.Mich.1988) (oral communications intercepted via inadvertently open phone line are not wire communications), *rev'd on other grounds sub nom. United States v. Baranek,* 903 F.2d 1068 (6th Cir.1990).

■ The Company contends that title III does not cover the interception of oral communications via a wire transmission. The statute, however, does include such interceptions within its purview. "Both wiretapping and bugging are regulated under Title III." *Dalia,* 441 U.S. at 241 n. 1, 99 S.Ct. 1682 (citing §§ 2510(1) and (2)). Bugging "includes the interception of all oral communication in a given location.... [T]his interception typically is accomplished by installation of a small microphone in the room to be bugged and *transmission* to some nearby receiver." *Id.* (emphasis added) (citations omitted). No reason appears why transmission through wire technology rather than in some other fashion does not fall under the ambit of title III.

### 2. *"Provider of Wire or Electronic Communication Service"*

■ The question next becomes whether the Company had an obligation pursu-

---

**11.** To "intercept" a communication "means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." § 2510(4).

**12.** A "wire communication" is defined as:

any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the

transmission of interstate or foreign communications or communications affecting interstate or foreign commerce.

§ 2510(1). Despite the apparent wireless nature of cellular phones, communications using cellular phones are considered wire communications under the statute, because cellular telephones use wire and cable connections when connecting calls. *See id.;* S.Rep. No. 99–541, at 11, *reprinted in* 1986 U.S.C.C.A.N. at 3565(explaining that addition of "switching station" as part of definition of wire communication was meant to incorporate *cellular communications); H. Rep. No. 99–647, at 31 (1986); Bartnicki,* 532 U.S. at 524, 121 S.Ct. 1753.

ant to § 2518(4) to assist law enforcement in intercepting the oral communications in the car. If the Company is "a provider of wire or electronic communication service, landlord, custodian or other person," then it is so obligated. *See* § 2518(4).

The Company contends that it is not a "provider of wire or electronic communication service" because it does not operate the cellular service used as part of the System.[13] This contention lacks force.

There is a clear, albeit somewhat complicated, textual basis for concluding that the Company's contract with the cellular phone company does not allow it to evade the duties imposed by the wiretapping statute. For purposes of § 2518(4),

> "wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception (including the use of such connection in a switching station) furnished or operated by any person engaged in providing or operating such facilities for the transmission of ... communications;

18 U.S.C. § 2510(1). Additionally,

> "electronic communication service" means any service which provides to users thereof the ability to send or receive wire or electronic communications;

18 U.S.C. § 2510(14).[14] As noted, cellular telephone service, despite its apparent wireless nature, is within § 2510(1)'s definition of "wire communication"[15] because cellular service uses wire and cable connections to connect calls.[16]

To determine whether the Company is "a provider of wire or electronic communication service" under § 2518(4), it is helpful to track the times the statute uses a form of the word "provide." We count three instances:

> (because the term "electronic communication service" already captures those services that provide "wire communications") or impenetrable (because a provider of wire communication service, as used in § 2518(4) means something other than a "service which provides to users thereof the ability to send and receive wire ... communications," as such a service is an electronic, and not a wire, communication service).

**15.** The System may also provide "electronic communication." It is our understanding that for purposes of the stolen vehicle recovery mode, the Company transmits an electronic signal to the vehicle that leads the System to call into the service center and open a live phone line between the vehicle and the service center. This electronic signal, however, does not transmit the communication sought to be intercepted. We therefore do not consider whether the System provides "electronic communication."

**16.** *See supra* note 12; *see generally United States v. Reyna,* 218 F.3d 1108 (9th Cir.2000); *United States v. Duran,* 189 F.3d 1071 (9th Cir.1999).

**13.** We note that the listed entities who can be drafted to assist law enforcement has become broader over the more than thirty years that the provision has been in place. Initially, the statute listed "communication common carrier," rather than "a provider of wire or electronic communication service." *See* Pub.L. No. 91–358 (1970); Pub.L. No. 99–508 (1986). By amending the statute, Congress undeniably intended to expand the scope of the provision to cover more than common carriers. *See* Sen. Rep. 99–541 (1986) (Electronic Communications Privacy Act sought to expand entities covered by title III beyond common carriers); *Camacho v. Autoridad de Telefonos de Puerto Rico,* 868 F.2d 482 (1st Cir.1989) (holding that a connecting carrier fits under the umbrella of § 2518).

**14.** That the term "electronic communication service" includes both "electronic communication" (which is defined separately, *see* § 2510(12)) and "wire communication" is one of this statute's many anomalies. There is no analogous definition for "wire communication service." Thus, § 2518(4)'s use of the phrase "a provider of wire or electronic communication service" is either redundant

*First,* § 2510(1) defines a "wire communication" as an "aural transfer made ... through facilities ... furnished or operated by any person engaged· in *providing* or operating such *facilities* for the transmission of interstate or foreign communications." *Id.* (emphasis added). Here, the "facilities" referred to belong to the cellular phone company. That cellular phone company is the "person" that "furnishe[s] or operate[s]" those facilities.

*Second,* § 2510(14) defines an "electronic communication service" as a "service which *provides* to users ... the ability to send or receive wire ... communications." *Id.* (emphasis added). The System as a whole undoubtedly "provides users ... the ability to send or receive wire ... communications." These wire communications are sent via the cellular network.

*Third,* § 2518(4) targets "providers" of "wire or electronic communication service." Under our reading of the statute, the Company is the "provider" and the System is the "electronic communication service" that it offers, even though the Company neither "furnishes" nor "operates" the cellular facilities that actually perform the "aural transfer" referred to in § 2510(1).

The Company's customers are billed by the Company for the airtime and have no direct dealings with the cellular telephone company. Using the term "provides" as one would in ordinary discourse, it is the Company, not the cellular telephone company, that "provides" the communication service to its customers.

The service-providing structure here is very much akin to circumstances in which an established long-distance telephone carrier offers *local* phone service even though it does not own or operate any of the local infrastructure. *Cf. Verizon Communications, Inc. v. FCC,* 535 U.S. 467, 475–76, 491–92, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002); *see also* Mike Langberg, *Bundles Can Offer Phone Bargains,* SAN JOSE MERCURY NEWS, Jan. 23, 2003, at 1E; Yochi J. Dreazen, *Supreme Court Rules Against Bells,* WALL ST. J., May 14, 2002, at A2. Customers pay the long-distance carrier for local service; the long-distance carrier then pays fees to the local telephone company for use of its lines. Nevertheless, from the point of view of the customers, the long-distance carrier is clearly the "provider of[the] wire or electronic communication service." [17] Similarly, the Company provides "a wire or electronic communication service" to its customers even though it could not do so without the cellular telephone company's services. [18]

That the "provider of wire or electronic communication service" mentioned in § 2518(4) may be distinct from the "person" in § 2510(1) who "furnishe[s] or operate[s]" "facilities for the transmission of communications" is confirmed by a separate provision of the wiretapping statute—

---

**17.** This example focuses, of course, exclusively on the long-distance carrier's *local* service. It goes without saying that a long-distance carrier is a "provider of wire or electronic communication service" with regard to its long-distance service.

**18.** *Amati v. Woodstock,* 1997 WL 587493 (N.D.Ill.1997), is not to the contrary. In *Amati,* a district court held that an Emergency Telephone System Board that used a dictaphone logger to record incoming calls was not "a provider of wire or electronic communication service." *Amati* was an easy case because callers presumably used their own personal telephones to communicate with the Board. The Board therefore operated like any other entity that receives phone calls from its customers. Entities that merely receive phone calls from their customers do not provide a "service which provides to users ... the ability to send or receive wire ... communications." § 2510(14). By contrast, the Company does provide a § 2510(14) service.

§ 2511(2)(a)(i). Section 2511(2)(a)(i), which exempts designated persons from the wiretapping laws when "intercepting" communications is a "necessary incident" to their business, specifies that the exemption only extends to "an officer, employee, or agent of a provider of wire or electronic communication service, *whose facilities are used in the transmission of a wire or electronic communication." Id.* (emphasis added). Thus, the statute distinguishes between those service providers that furnish their own facilities, and those service providers like the Company that do not.[19] Section 2518(4), in contrast, makes no such distinction. So the Company is covered by that section and required to provide such assistance as that section requires.

### 3. *"Other Person"*

■ There is a second, distinct reason for concluding that the Company is covered by § 2518(4). That provision obligates not only a "provider of wire or electronic communication service" but also a "landlord, custodian or other person" to assist law enforcement in intercepting communications. The government maintains that the Company is an "other person" within the meaning of the statute. We agree.

Section 2510 *et seq.* do not define the term "other person." "Person" is defined as "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." § 2510(6). That definition, which includes almost every possible individual and entity,[20] is not helpful in delineating which such persons are obligated to assist law enforcement in surveillance activities. "Other person" as used in § 2518(4) is clearly not meant to apply to all "persons," without restriction; otherwise there would be no point in enumerating "a provider of wire or electronic communication service, landlord, custodian *or other person*." (Emphasis added).

Other sections of the statute do apply to "any person." Section 2511, for example, states that "*any* person" can be liable for violating that prohibition. *See* § 2511(1) (emphasis added). That § 2518(4) uses the term "*other* person," and uses it following a specific list of enumerated individuals and entities, suggests a considerably more limited meaning of "other person" in § 2518(4) than of "any person" as used in § 2511(1).

That limited meaning can be determined by a careful reading of § 2518(4) in the context of the statute as a whole. First, § 2518(4) indicates that an "other person" is someone who provides "services" to the target: "[A] provider of wire or electronic communication service, landlord, custodian or other person shall furnish ... all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the

---

**19.** That the Company provides what is clearly a *communication* service is central to our holding. It would be a different situation entirely if the Company merely used wire communication as an incident to providing some other service, as is the case with a street-front shop that requires potential customers to speak into an intercom device before permitting entry, or a "drive-thru" restaurant that allows customers to place orders via a two-way intercom located beside the drive-up lane. Here, the originating apparatus that results in a wire communication

(which, again, is distinct from the oral communication that the government is attempting to surveil) is located inside the service recipient's car and belongs to the service recipient. Thus, in addition to navigational and roadside assistance, the Company plainly offers its customers a *communication* service.

**20.** Some courts have held that municipalities are not included in the § 2510 definition of "person." *See, e.g., Abbott v. Village of Winthrop Harbor,* 205 F.3d 976, 980–81 (7th Cir. 2000).

*services that such service provider, landlord, custodian, or person is according the person whose communications are to be intercepted."* § 2518(4) (emphasis added).

Second, an "other person," as that term is used in title III, § 2510 *et seq.,* must also be an entity or individual who can provide information, technical assistance, or facilities to law enforcement. Throughout § 2510 *et seq.,* the term "other person" is often followed by: "who furnishes facilities or technical assistance...." Section 2518(4) itself directs the "provider ...., landlord, custodian or other person" to "furnish the applicant ... all *information, facilities and technical assistance* necessary ...." § 2518(4) (emphasis added). The section also provides for compensation to "[a]ny provider ..., landlord, custodian or other person furnishing such *facilities or technical assistance* ...." *Id.* (emphasis added). Other sections of the statute use similar language. *See, e.g.,* § 2511(2)(a)(ii) (referring to immunity provided to "any provider of wire or electronic communication service, its officers, employees, or agents, landlord, custodian, or other specified person for providing *information, facilities, or assistance* ...") (emphasis added); *see also* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA Patriot Act), Pub.L. No. 107–56, § 222 (2001) ("A provider of a wire or electronic communication service, landlord, custodian, *or other person who furnishes facilities or technical assistance* pursuant to section 216 shall be reasonably compensated for such reasonable expenditures incurred in providing such facilities or assistance") (emphasis added). These other uses of the term

guide our interpretation of § 2518(4). *See Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 479, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (applying principle that identical terms within an act ordinarily bear the same meaning) (citing *Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990); *Sorenson v. Sec'y of the Treasury,* 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986)).

Standard principles of statutory interpretation comport with our understanding of "other person." Two of the so-called "canons" of statutory interpretation are of some assistance: The first, *noscitur a sociis* (known by its associates), suggests that a word with multiple meanings is often best interpreted with regard to the words surrounding it. *Gutierrez v. Ada,* 528 U.S. 250, 254–55, 120 S.Ct. 740, 145 L.Ed.2d 747 (2000). The second, *ejusdem generis* (of the same class), indicates that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 114–15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)).[21]

The common threads among the otherwise disparate list of individuals and entities in § 2518(4) are: (1) each regularly provides some service to the target of the surveillance; (2) each has or can arrange access to facilities or technical assistance necessary to intercept communications.

Similarly, landlords and custodians are uniquely situated to assist law enforcement

---

**21.** Such techniques of statutory interpretation are not to be used mechanically in every instance. "Like many interpretive canons ... *ejusdem generis* is a fallback, and if there are good reasons not to apply it, it is put aside." *Circuit City Stores, Inc.,* 532 U.S. at 138, 121

S.Ct. 1302 (Souter, J., dissenting). Here, however, these tools of interpretation are useful in confirming the meaning of the term "other person" otherwise suggested by the structure and logic of the statute.

in placing interception devices in buildings they own or manage. The premises are under the landlord's control, so he or she controls access to the building, access that may be necessary to place surveillance equipment. *See Dalia,* 441 U.S. at 250 n. 10, 99 S.Ct. 1682. A custodian is often in charge of a building when a landlord is absent. *See* Oxford English Dictionary (2d ed.1989) (defining "custodian" as "[o]ne who has the custody of a thing or person; a guardian, keeper").

The Company argues that the entities specifically named in § 2518(4) share more limited common characteristics that the Company does not, namely "(1) an interest in the crime being investigated because their services or property are being used in furtherance of a crime, and (2) a property right in the facilities being used in furtherance of a crime." We disagree. While phone lines can be used to facilitate illegal transactions—as with gambling or drug dealing, for example—communications over tapped phone lines may instead simply provide law enforcement information about a past or future crime, without facilitating its commission. Similarly, oral communications discussing a past or future criminal venture can take place in an apartment or other location, although that location is not itself used to facilitate the commission of the crime.

For all these reasons, we read the term "other person" in § 2518(4) to mean an individual or entity who both provides some sort of service to the target of the surveillance and is uniquely situated to assist in intercepting communications through its facilities or technical abilities. The holding of the only other court of appeals to examine the "other person" lan-

guage in § 2510 *et seq.* comports with our analysis. *Camacho v. Autoridad de Telefonos de Puerto Rico,* 868 F.2d 482 (1st Cir.1989), addressed the reach of the "other person" language in another section of the statute, § 2511(2)(a)(ii). *Id.* at 489–90. Its holding that the "other person" language includes a connecting carrier who is not a common carrier comports with our understanding of the term as used in § 2518(4). *Id.*

The Company regularly supplies to the car owner the services provided by the System. The Company is also uniquely situated to facilitate the interception of the oral communications within the vehicle; only it can contact the car and place it into stolen vehicle recovery mode by opening a phone line to the car. Even though it might be possible for the cellular phone company to assist law enforcement in monitoring the oral communications within the vehicle once the phone line is open, the Company can do so much more simply, as the System is programmed to place a call to the Company's operators.

The Company therefore fits our understanding of "other person." Thus, for this reason as well, if the orders are otherwise proper under the statute, the Company can be obligated pursuant to § 2518(4) to assist the FBI by "furnish[ing] ... information, facilities and technical assistance...." § 2518(4).[22]

### 4. *Scope of the Order*

■ The Company contends that even if it falls within the list of entities in § 2518(4), the statute precludes the orders issued here. In support of this contention, the Company points to the following language in the Senate Report on the Elec-

---

**22.** Contrary to the Company's suggestion, it cannot be held liable to its customers for any "cause of action" arising out of its compliance with § 2518(4). *See* § 2511(2)(a)(ii); *see also* H.R.Rep. No. 95–1283, at 98–99 (1978);

H.R. Conf. Rep. No. 95–1720, at 35 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3904, 4064(describing grant of "immunity" to "any person who provides such assistance in accordance with a court order").

tronic Communications Privacy Act of 1986: "[Title III] should not be construed as authorizing issuance of an order for land line telephone company assistance which either requires a company to actually accomplish or perform the wiretap or requires that law enforcement wiretap activity take place on land line telephone company premises." S.Rep. No. 99–541, at 29–30 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3555, 3583–84. From this language, we are asked to infer that no order requiring either use of any entity's premises or hands-on assistance by a company's personnel is permissible.

▇ We may not read the legislative history to limit a statute's unmistakable directive. *See United States v. Hagberg*, 207 F.3d 569, 574 (9th Cir.2000); *Or. Nat. Res. Council, Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir.1996). The language of the statute explicitly permits an order that requires covered entities to provide not only "information," but also "facilities and technical assistance." The legislative history cannot take back authority indisputably granted by the statute.

Nor do we think the Committee Report meant to indicate that the statute means something other than what it says. Instead, the Senate Report signifies the Committee's understanding of the practical realities encountered in wiretapping traditional telephones: Such wiretapping requires only minimal assistance from carriers, because law enforcement is familiar with the technology and needs only access to wires remote from the carrier's premises. *See* S.Rep. No. 99–541, at 29–30. Section 2518(4) limits assistance to only that which is "necessary" to accomplish the interception: "[A] provider of wire or electronic communication service ... or other person shall furnish the applicant forth-

with all information, facilities, and technical assistance *necessary* to accomplish the interception...." *Id.* (emphasis added). Because, as the report indicates, no such hands-on assistance or access to company premises is *necessary* with regard to land line telephones, none may be required.

In contrast to standard land line wiretaps, the FBI cannot intercept communications in the vehicle without the Company's "facilities [or] technical assistance." Since such hands-on assistance is necessary, assistance may be mandated by an order under § 2518(4). *Cf.* S.Rep. No. 99–541, at 29(recognizing that cellular service providers allow law enforcement to use their premises and that Congress did not intend to alter this arrangement with any of its 1986 amendments to title III).

## D. *Requirement of a Minimum of Interference*

▇ That the Company is both a "provider of wire or electronic communication service" and an "other person" within the meaning of § 2518(4), and may therefore be required to furnish facilities and technical assistance is not, however, the end of the story. The question remains whether the order goes too far in interfering with the service provided by the Company, by preventing the Company from supplying the System's services to its customers when a vehicle is under surveillance. We conclude that it does.

Court orders granted pursuant to the authority of § 2518 must specify that assistance be provided "unobtrusively and with *a minimum of interference* with the services that such service provider, landlord ... or person is according the person whose communications are to be intercepted." § 2518(4) (emphasis added).[23] The "a minimum of interference" language was

---

**23.** We note that the "a minimum of interference" obligation is distinct from the "mini-

mization" requirement contained within § 2518(5). The minimization requirement di-

added in 1970 as part of the amendment that added the explicit assistance requirement to title III. Pub.L. No. 91–358, § 211(b) (1970).

Looking at the language of the statute, the "a minimum of interference" requirement certainly allows for *some* level of interference with customers' service in the conducting of surveillance.[24] We need not decide precisely how much intereference is permitted. "A minimum of interference" at least precludes total incapacitation of a service while interception is in progress. Put another way, eavesdropping is not performed with "a minimum of interference" if a service is *completely* shut down as a result of the surveillance.[25]

Our interpretation of the "a minimum of interference" language is bolstered by our reading of title III, which, we believe, does not evince a congressional intent to authorize surveillance in the face of complete disruption of a wire and electronic communication service for a particular customer. As the Supreme Court stated in *United States v. New York Telephone Co.*, "[t]he conviction that private citizens have a duty to provide assistance to law enforcement officials when it is required is by no means foreign to our traditions." 434 U.S. at 175 n. 24, 98 S.Ct. 364. At the same time, the Supreme Court stressed that the order in question in that case (approved under the All Writs Act, not title III) "required minimal effort on the part of the Company and *no disruption to its operations.*" *Id.* at 175, 98 S.Ct. 364 (emphasis added). The obligation of private citizens to assist law enforcement, even if they are compensated for the immediate costs of doing so, has not extended to circumstances in which there is a complete disruption of a service they offer to a customer as part of their business, and, as we read title III, Congress did not intend that it would.[26]

rects law enforcement to intrude as little as possible into the private communications of the targeted individuals unrelated to the criminal activity under investigation. *See Dalia*, 441 U.S. at 250 n. 11, 99 S.Ct. 1682 (citing 18 U.S.C. § 2518(5)); *United States v. McGuire*, 307 F.3d 1192, 1199–1202 (9th Cir.2002). In other words, when the target of surveillance is talking about unrelated matters, law enforcement should stop listening to the conversation and then periodically monitor the conversation for pertinent communications. *See id.* at 1201–02.

**24.** It is not clear what purpose Congress had in mind by inserting the language in the statute. The amendment was added without comment, so there is no legislative history to guide our interpretation of the language.

**25.** The dissent's exegesis on the word "minimum" is unpersuasive. The construction "a minimum of," when followed by a noun such as interference (as opposed to a number), is an idiom that in common parlance means something different from the relational term "minimum" standing alone. For instance, if a customer instructed a carpenter to perform a routine house repair "with a minimum of expense," the carpenter would not be authorized to perform a one million dollar job, even if it were impossible to do it for less.

**26.** The dissent relies on *New York Telephone* for the proposition that "[s]ervice disruption that is severe enough to result in serious adverse effects on a provider may be prohibited by the doctrine of undue burden." *Post* at 1148. *New York Telephone*, however, was decided under the All Writs Act, not title III. 434 U.S. at 168, 98 S.Ct. 364. It is one thing to read an undue burden limitation into the seemingly unbounded authority to issue orders that the generally worded All Writs Act appears to provide the federal courts. It is quite another to read limitations into title III that do not appear in it. Title III is an intricately worded statute that contains its own guidelines on the issuance of judicial orders; there is no gap to fill. Instead, Congress captured some of the same concerns addressed by the "undue burden" concept in the "a minimum of interference" limitation.

Similarly, *Mountain States* also was decided under the All Writs Act, and does not interpret the language here at issue. The dissent's apparent reliance on *Mountain States, post* at 1148, is therefore misplaced.

In this case, FBI surveillance completely disabled the monitored car's System. The only function that worked in some form was the emergency button or automatic emergency response signal. These emergency features, however, were severely hampered by the surveillance: Pressing the emergency button and activation of the car's airbags, instead of automatically contacting the Company, would simply emit a tone over the already open phone line. No one at the Company was likely to be monitoring the call at such a time, as the call was transferred to the FBI once received. There is no assurance that the FBI would be monitoring the call at the time the tone was transmitted; indeed, the minimization requirements, *see* note 23, *supra*, preclude the FBI from listening in to conversations unrelated to the purpose of the surveillance. Also, the FBI, however well-intentioned, is not in the business of providing emergency road services, and might well have better things to do when listening in than respond with such services to the electronic signal sent over the line. The result was that the Company could no longer supply any of the various services it had promised its customer, including assurance of response in an emergency.

We hold that whatever the precise limits Congress intended with its "a minimum of interference" limitation, the level of interference with the System worked by the FBI's surveillance is not "a minimum of interference with the services" that the

Company "accord[s] the person whose communications are to be intercepted." § 2518(4). Because, given the set-up of the System, the surveillance could not be completed with "a minimum of interference," the district court erred in ordering the Company's assistance.[27]

## Conclusion

The Company can properly be considered an "other person" for purposes of § 2518(4), and therefore the district court could have ordered the Company to assist the FBI in intercepting oral communications if the other requirements of § 2518(4) had been met. In this instance, however, the Company could not assist the FBI without disabling the System in the monitored car. Therefore, under the "a minimum of interference" requirement of § 2518(4), the order should not have issued. We therefore REVERSE the order of the district court.

TALLMAN, Circuit Judge, dissenting:

I respectfully dissent. I agree that 18 U.S.C. § 2518(4)[1] applies to the Company as a "provider" or "other person" and therefore the district court had the authority to order it to assist the FBI in intercepting conspiratorial conversations held in the car and transmitted electronically via the Company's System. *See* Maj. Op. at 1139–43. I disagree, however, with the majority's conclusion that the order cannot

---

27. The Company might well be able to design its System in such a way that surveillance could be conducted without disrupting the other System services. The current statute does not, however, require that the Company redesign its System to facilitate surveillance by law enforcement. *Compare* 47 U.S.C. § 1002(requiring telecommunications carriers to design equipment, facilities, and services in ways that facilitate government surveillance and to do so in a manner that allows communications to be intercepted "unobtrusively and with a minimum of interference.").

1. This provision was included under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90–351 (1968). It has since been amended in response to changes in technology and cases interpreting its provisions. Applications for court orders authorizing electronic eavesdropping are filed *ex parte* with Article III judges and must establish probable cause and necessity for the intercept sought. *See* 18 U.S.C. § 2518(3). These applications are known colloquially as "Title III applications."

be carried out in conformance with § 2518(4). The FBI established to the district court's satisfaction the existence of probable cause to believe that individuals engaged in a continuing criminal enterprise were using the car as a venue for planning illegal activities. Pursuant to § 2518(4), the district court found the necessity for this type of intercept and authorized federal agents to surreptitiously monitor the individuals' conversations.

The majority opinion nonetheless invalidates the district court's order, despite express statutory language commanding the Company to assist the government in such eavesdropping. The court reaches this result by erroneously concluding that the district court's order cannot be carried out "with 'a minimum of interference.'" Maj. Op. at 1146. This holding cannot be reconciled with the plain text of the statute.

### I

Section 2518(4) sets out the requirements for the execution of a judicially authorized intercept order where the assistance of a communication service provider is necessary. Specifically, the provider

> shall furnish the [government] forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such service provider, landlord, custodian, or person is according the person whose communications are to be intercepted.

18 U.S.C. § 2518(4). The plain meaning of the phrase "minimum of interference" is clear: an order must be executed in the manner that causes the *least amount of disruption necessary* to intercept the targeted communication. Significantly, § 2518(4) does not require the method of interception to allow the monitored communication service to continue without *any*

interruption. Here, the record leaves no doubt that the Company complied with the challenged order in the way least likely to interfere with its subscriber's services and that, in fact, no actual service disruption occurred. The majority opinion ignores the record on how the intercept was implemented and contorts the meaning of "a minimum of interference."

As a threshold matter, there is no evidence that any service disruption actually occurred. The record does not indicate that the subjects of the surveillance tried to use the System while the FBI was listening. One cannot disrupt a service unless and until it is being utilized. Moreover, even accepting *arguendo* the majority's characterization of the emergency call function as "severely hampered" by the surveillance, Maj. Op. at 1146, this characterization by its own terms belies the claim that the Service was "*completely* shut down," *id.* at 1145 (emphasis in original). The record reflects that the emergency call function was still operational, albeit monitored by the FBI rather than a Company operator. In any event, as there is no record that an emergency signal or a call for service was ever transmitted on the System during government surveillance, the majority can only speculate that federal agents would have done nothing had the occupants sought help by pushing a button or if the emergency call function had been automatically activated by the deployment of an airbag.

The majority opinion also makes the fundamental mistake of treating "a minimum of interference" as an absolute threshold instead of a relative standard. As revealed by a brief review of dictionary definitions, a "minimum" is a concept that depends upon there being *no lesser amount. See, e.g., American Heritage Dictionary of the English Language, New College Edition* 835 (1976) (defining "minimum" in its noun form as "[t]he *least possible* quantity or degree ... [or t]he

lowest quantity, degree, or number reached or recorded; *the lower limit of variation* ") (emphasis added); *see also Oxford English Dictionary (OED )*, *available at* http:// www.oed.com/ (defining the noun form of "minimum" as "[t]he smallest portion into which matter is divisible; an atom. Also, the hypothetical *smallest possible* unit of time or space . . .") (emphasis added).

These definitions confirm that "a minimum of interference" must mean the *lowest, least,* and *smallest* amount of interference *possible,* whatever that amount might be. The record indicates that the only method of executing the intercept order in this case involved activating the car's microphone and transferring the car's cellular telephone link to the FBI. This conduct might have amounted to a service disruption had the subjects of the surveillance attempted to use the System, but there is no evidence that they did. The majority concludes that "eavesdropping is not performed with 'a minimum of interference' if a service is *completely* shut down as a result of the surveillance." Maj. Op. at 1144–45. However, even the complete shutdown of a service can represent the *minimum* interference, so long as no lesser amount of interference could satisfy the intercept order. It is not an ineluctable conclusion that no compliance is required if nothing less will do the job.

The majority creates—under the guise of limiting the assistance a provider or other person may be required to render— a wide-ranging form of protection for the legitimate targets of government surveillance. But Congress legislated only very limited restrictions on the effect of intercept orders once authorized by Article III judges under § 2518. As it fails to identify any real service disruption, much less explain how the Company could have administered the intercept in a way that would cause *less* interference, the majority's statutory argument is unsupportable.

## II

Furthermore, it is important to recognize that giving the phrase "a minimum of interference" its proper reading does not foreclose providers from pursuing other remedies where an order causes them some hardship.[2] Service disruption that is severe enough to result in serious adverse effects on a provider may be prohibited by the doctrine of undue burden. As a general principle, an intercept order may not impose an undue burden on a company enlisted to aid the government. *See United States v. New York Tel. Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) ("[T]he power of the federal courts to impose duties upon third parties is not without limits; unreasonable burdens may not be imposed."); *see also United States v. Mountain States Tel. & Telegraph Co.,* 616 F.2d 1122 (9th Cir.1980) (affirming a district court's order compelling Mountain States to perform a trace of telephone calls by means of electronic facilities within the company's exclusive control because "the obligations imposed . . . were reasonable ones.") (citing *New York Tel.,* 434 U.S. at 172, 98 S.Ct. 364). If such an order is determined to be unreasonably burdensome, then relief may be available.[3]

**2.** The district court expressly understood "that the government is required to compensate [the Company] for its reasonable expenses incurred in providing such facilities or assistance." 18 U.S.C. § 2518(4). There is no evidence of record that the Company sought reimbursement for the short time it took for an operator to surreptitiously activate the System's microphone inside the car and transfer the now open cellular telephone link to the FBI.

**3.** The majority mistakenly cites *New York Telephone* as supporting the proposition that the "complete disruption" of a customer's service is *per se* more than "a minimum of

Here, although the Company argued that compliance with the order might harm its emerging business (because people might not subscribe to its service if they become aware of this potential for court-ordered eavesdropping), the district court properly found the evidence insufficient to establish that the terms of the challenged order were overly or unreasonably burdensome. After listening to the evidence presented at the hearing, the district court concluded that "[the Company] has not shown this Court through its arguments and testimony that it's [sic] compliance with the Court's Order ... is overly or unreasonably burdensome."[4] To disregard this finding, we must declare it "clearly erroneous." *See Easley v. Cromartie*, 532 U.S. 234, 242, 121 S.Ct. 1452, 149 L.Ed.2d 430 (2001); *accord Freeman v. Allstate Life Ins. Co.*, 253 F.3d 533, 536 (9th Cir.2001). The record simply will not support the majority's ruling.

### III

It is undisputed in this case that the intercept order was administered in the manner that caused the least possible interference with the subscriber's service and that the district court determined that the order was not unduly burdensome. This should end the analysis and lead to the conclusion that the district court properly ordered the provider to comply. Instead, the majority repeats the error of *Application of the United States*, 427 F.2d 639 (9th Cir.1970), the very decision that prompted Congress to amend 18 U.S.C. § 2518(4) to include the language relied upon by the district court to compel the Company's cooperation. *See Mountain States*, 616 F.2d at 1131; Maj. Op. at 1137 n. 8. Because the court's holding that the order violated § 2518(4) is based on a flawed reading of the statute, disregards the factual findings of the district court, and undermines an important investigative tool in a manner that defies common sense, I respectfully dissent.

---

interference." *See* Maj. Op. at 1145. The Court in *New York Telephone* held that a lower court's order compelling the telephone company to aid the FBI in installing a pen register was "clearly authorized by the All Writs Act [28 U.S.C. § 1651(a)] and was consistent with the intent of Congress." *New York Tel.*, 434 U.S. at 172, 98 S.Ct. 364. In so holding, the Court observed that the challenged order was not unreasonably burdensome because the *company's operations* were not disrupted; it did not consider the challenged order's effect on the *customer's service*. *See id.* at 175, 98 S.Ct. 364. At any rate, the district court here explicitly found that compliance with the order did not "overly or unreasonably" burden the Company's operations. Thus, to the extent *New York Telephone* applies in this case, it does not support the majority's opinion.

4. The record shows that the Company's System consists of nothing more complicated than a cellular telephone (with built-in speaker and microphone), a global positioning satellite transmitter, and a control box that determines which of two call centers will be alerted when the customer pushes one of three buttons: emergency, information, and roadside assistance. The equipment is installed before the customer takes delivery of the car. Pursuant to the challenged order, the Company call center operator's only responsibility is to activate the microphone and transfer the cellular link to the FBI field office conducting the surveillance.